OPINION OF THE COURT
Lucindo Suarez, J.
THE TRUE ADMINISTRATION OF JUSTICE IS THE FIRMEST PILLAR of good government.[1] The courts of this state cannot be true to George Washington’s conviction when the most vulnerable in our society, children and indigent adults, appear in courts without advocates to champion or defend their causes. The pusillanimous posturing and procrastination of the executive and legislative branches have created the assigned counsel crisis impairing the judiciary’s ability to function. This pillar is essential to the stability of our political system. It should therefore be continually strengthened and not allowed to crumble into the detritus of a constitutional imbalance among the branches of government. Equal access to justice should not be a ceremonial platitude, but a perpetual pledge vigilantly guarded.
The issue in this bench trial for a declaratory judgment and permanent injunction is whether New York State’s failure to increase the compensation rates for assigned counsel violates the constitutional and statutory right to meaningful and effective representation. This court finds beyond a reasonable doubt that it does and results, inter alia, in obstructing the judiciary’s ability to function, and therefore declares the statutes setting forth those rates unconstitutional as applied, and directs payment of $90 an hour without distinction between in- and out- *763 of-court work, and without ceilings on total per case compensation, until the Legislature acts to address the issue.[2]
What has emerged from the evidence is the grim reality that children and indigent adults in the New York City Family Court, Criminal Court, and Criminal Term of Supreme Court are at unreasonable risk of being subjected to a process that is neither swift nor deliberate, and fails to confirm the confidence and reliability in our system of justice. This is a direct result of the Legislature’s failure to provide adequate compensation to assigned counsel. The right of a criminal defendant or Family Court litigant to interpose an attorney between himself and the State with its considerable power and resources is a cherished principle, zealously protected by New York courts. The State of New York continues to ignore its constitutional obligation to the poor by failing to increase the assigned counsel rates that result, in many cases, in denial of counsel, delay in the appointment of counsel, and less than meaningful and effective legal representation. Accordingly, this court declares those portions of section 722-b of the County Law, section 245 of the Family Court Act and section 35 of the Judiciary Law to be unconstitutional as applied. These statutes were enacted without a mechanism for automatic periodic increases, therefore requiring recurrent visitation by the Legislature.[3] The initial rate set in 1965 of $15 an hour for in-court work *764 and $10 an hour for out-of-court work has been increased twice to $25 and $15 in 1978, and $40 and $25 in 1985. The last increase was 17 years ago.
This court previously found New York County Lawyers’ Association (NYCLA) to have standing and its claims justiciable. (New York County Lawyers’ Assn. v Pataki, 188 Misc 2d 776 [Sup Ct, NY County 2001], affd 294 AD2d 69 [1st Dept 2002].) Thereafter a mandatory preliminary injunction was issued directing payment of an interim rate of $90 an hour without a cap for total per case compensation or distinction between in- and out-of-court work, holding in abeyance any declaration that the assigned counsel statutory scheme is unconstitutional as applied. (New York County Lawyers’ Assn. v State of New York, 192 Misc 2d 424 [Sup Ct, NY County 2002].)
This court finds upon the evidence of 41 witnesses and 435 exhibits that (1) assigned counsel are necessary; (2) there are an insufficient number of them; (3) the insufficient number results in denial of counsel, delay in proceedings, excessive case loads, and inordinate intake and arraignment shifts, further resulting in rendering less than meaningful and effective assistance of counsel, and impairment of the judiciary’s ability to function; and (4) the current assigned counsel compensation scheme — the rates, the distinction between the rate paid for in- and out-of-court work, and the monetary caps on per case compensation — is the cause of the insufficient number of assigned counsel.
Assigned counsel[4] are necessary in the Family Court, Criminal Court and Criminal Term of Supreme Court based upon the system selected by New York City to provide counsel to the indigent and in order to service multi-defendant/respondent cases. There is a substantial need for assigned counsel to represent both children and indigent adults in family and criminal proceedings. (See, transcript at 251-254 [Segal, J.]; 784-802 [Lopez-Torres, J.]; 882-885 [Spinak]; exhibits 120, 246-247.) The assigned counsel plan in New York City has evolved into the primary source of legal representation for adults in Family Court proceedings: abuse, neglect, custody, child protective, *765 and domestic violence cases. (See, transcript at 60-61 [Law]; 251-253 [Segal, J.]; 334 [Weinberger]; 408-409 [Leidholdtj; 638-639 [Drinane]; 710 [Córtese]; exhibit 157 at 18.) The Legal Aid Society and the other institutional providers represent one defendant or respondent in a multiple defendant or respondent case. The assigned counsel plan serves a vital and important function by providing representation to indigent defendants and respondents in cases where the institutional providers have a conflict of interest. (See, transcript at 16-17, 38, 45-48 [Firetog, J.]; 1084-1087 [Mogulescu, J.]; 2360-2361, 2374-2377 [Angioletti]; exhibits 102-103, 124 at 14; 261.) These conflicts of interest occur frequently in juvenile delinquency cases and on a regular basis in child protective proceedings. (See, transcript at 59-61, 106 [Law]; 251-252 [Segal, J.]; 639, 641, 656-658, 697 [Drinane]; 710 [Córtese]; 786-787 [Lopez-Torres, J.]; 886-887 [Spinak].) In 2001, the Juvenile Rights Division (JRD) of the Legal Aid Society represented approximately 40,000 children in New York City Family Court with an average of 2.5 children per case. (See, transcript at 635, 641 [Drinane].) Assigned counsel today represent a greater proportion of the criminal defendants than originally contemplated by the assigned counsel plan. When adopted in 1966, it was expected that assigned counsel would represent criminal defendants only in homicide and conflict cases. (See, transcript at 1928 [Becker]; exhibits 119, internal exhibit D, at 2; 120 at 11; 124 at 13; 157 at 13; 297 at 5; 303-304; exhibit 1-1.) The evidence demonstrates that assigned counsel represent a substantial percentage of indigent defendants charged with felonies, misdemeanors and violations. (See, transcript at 1020-1028 [Yates, J.]; exhibits 104-105, 155 at 9; 157 at 9; 169-178A, 246-247, 261.) In the Kings County Criminal Term of Supreme Court, for example, assigned counsel represent 43% of defendants with cases pending. (See, transcript at 8-9, 22 [Firetog, J.]; exhibits 102-103.) Assigned counsel also represent indigent defendants in a substantial number of nonconflict cases. (See, transcript at 8-9, 16-17, 38 [Firetog, J.]; 1080 [Mogulescu, J.]; exhibits 102-103, 124 at 14; 261.) There has been an increase in the total number of defendants referred to the assigned counsel panels, as seen in the significant increase of misdemeanor and violation arrests and summonses issued in New York City since the mid-1990s. As a result, there is an even greater need for assigned counsel representation. (See, transcript at 1441-1448 [Spangenberg]; exhibits 106-117A, 124 at 14; 150, 157 at 5; 213-238, 246-247.)
*766 There are insufficient assigned panel attorneys to accommodate the need in the New York City Family Court. Judges and assigned counsel administrators testified they do not have a sufficient number of assigned counsel who are willing and available to staff intake parts. As a result, all five counties are frequently not staffed or woefully understaffed. In New York County Family Court, for example, 40% of all intake shifts in 2000 were not staffed with assigned counsel. (See, transcript at 64-68, 70-74, 79, 96-97, 113 [Law]; exhibits 50-52.) Similar problems exist in other counties. (See, transcript at 128-131, 135-136, 164 [Marotta]; 199-200 [Dalsimer]; 260-261, 264 [Segal, J.]; 298-299 [Gage, J.]; 336-342, 349-350, 358-361, 363-364 [Weinberger]; 465, 469-471 [Zimmerman]; 535-536 [Greenfield]; 674 [Drinane]; 785, 789 [Lopez-Torres, J.]; 892-893 [Spinak]; 1937 [Becker]; exhibits 14 at 18; 49-52, 59 at 4; 60A at 4; 63-65, 74, 97, 124 at 21; 145-148, 159, 290, 297 at 8; exhibit 1-1.) The evidence also showed that an average of 127 assigned counsel submitted fewer than 40 vouchers per year,[5] and these lawyers handled an average of only 7% of the total number of assigned cases; an average of 206 assigned counsel submitted more than 40 vouchers per year, and these lawyers handled an average of 93% of the total number of assigned cases (see, transcript at 889-893 [Spinak]; exhibits 310-311), approximately 50% of assigned counsel submitted vouchers indicating fewer than five hours of out-of-court work on all Family Court matters (see, transcript at 921-924 [Spinak]; exhibit 312); and counsel are never assigned to litigants in a large number of Family Court matters, including child protective and foster care placement and review proceedings. (See, transcript at 893-900 [Spinak]; exhibit 313.)
The lack of panel attorneys is evident in the Family Court intake parts. The intake part of the Family Court serves the same function as arraignment in the Criminal Court. The Family Court intake part has been described as a very fast paced, incredibly busy part with a very large calendar. (See, transcript at 786 [Lopez-Torres, J.].) Victims of domestic violence, juveniles that have been arrested, and litigants with initial petitions in child support proceedings or cases of neglect or *767 abuse, first appear in the intake part.[6] The nature of Family Court practice requires assigned counsel to staff the intake parts every day. Attorneys assigned to staff an intake part must be available to accept as many as 25 to 50 cases that come into the part on that particular day. (See, transcript at 66 [Law]; 129-130 [Marotta]; 262-263 [Segal, J.]; exhibits 49, 157 at 2; 185.) In addition, assigned counsel must also be available to accept cases that are not assigned to an attorney in the intake part. (See, transcript at 67-69 [Law]; 130-132, 136-138 [Marotta]; 255-256, 266-268 [Segal, J.]; 466-467 [Zimmerman]; 543 [Greenfield]; 783-788 [Lopez-Torres, J.].) Indeed, the Administrator of the First Department Law Guardian Program stated that, at the time of trial, there were approximately 65 active attorneys, but she would need 325 panel attorneys in order to adequately staff the assigned counsel needs of intake parts in Family Courts in Bronx and New York Counties. (See, transcript at 70, 87-88, 103 [Law]; exhibits 15-18, 44A.)
The severe shortage of assigned counsel willing and available to staff the Family Court intake parts resulted in the creation of an emergency case system in March 2001. This system prioritized the appointment of counsel to litigants in cases where a liberty or public safety interest was directly involved. Litigants in cases deemed nonemergency were not assigned an attorney although they were entitled to one. The triage system failed and was discontinued. Currently, litigants in emergency cases do not receive timely assignments of counsel because of the severe shortage of available assigned counsel. (See, transcript at 73-74, 98-99 [Law]; 156-158 [Marotta]; 350-359 [Weinberger]; 473-474 [Zimmerman]; 536-539 [Greenfield]; 617-619 [Leder]; 673-674 [Drinane]; 786-792 [Lopez-Torres, J.]; *768 834-838 [Schiffl; 907-909 [Spinak]; exhibits 3, 60A at 4; 66, 159, 197.)
There are an insufficient number of assigned panel attorneys to accommodate the need in the criminal courts. The number of active assigned counsel on the criminal court panels has substantially decreased.[7] The evidence has shown that there has been a substantial decrease in the number of active assigned counsel from 1995 to 2001 (see, transcript at 1439 [Spangenberg] ; exhibit 255); there have been substantial increases in the total number of criminal court misdemeanor filings and arraignments from 1989 to 2000 (see, transcript at 1441-1442 [Spangenberg]; exhibit 256). In fact, New York City admits a 20% increase in the filing of nonfelony cases from 1995 to 2001. (See, NY City exhibit D.) As stated earlier, in Kings County Supreme Court, Criminal Term, assigned counsel represent 43% of defendants with pending cases. (See, transcript at 8-9, 22 [Firetog, J.]; exhibits 102-103.) Also, large percentages of cases in other counties require assigned counsel. (See, transcript at 1003 [Collins, J.]; 1020-1028 [Yates, J.]; exhibits 104-105, 155 at 9; 157 at 9; 169-178A, 246-247, 261.) Multiple defendant cases require assigned counsel where the institutional providers have conflicts of interest. Moreover, there has been an increase in defendants referred to the assigned counsel panels, as established by the number of misdemeanor and violation arrests, and summonses issued in New York City since 1989. (See, transcript at 1441-1448 [Spangenberg]; exhibits 106-117A, 124 at 14; 150, 157 at 5; 213-238, 246-247.) Furthermore, assigned counsel are also needed to accept cases from other court parts, and cases that must be reassigned from other counsel at a later stage of the criminal proceedings. (See, transcript at 567, 571-573, 575 [Milano]; 1278 [Farrell]; 1316-1317 [Pickholz, J.].) Finally, the number of active assigned counsel on the criminal court panels has critically decreased. Present and former assigned counsel testified they have *769 reduced the number of criminal cases they accept or have stopped accepting them because of the current rates. Their testimony was corroborated by that of judges and administrators. (See, transcript at 28-29 [Firetog, J.]; 578 [Milano]; 1029 [Yates, J.]; 1131-1132 [Cohen]; 1172-1174 [Loving]; 1207 [Michaels]; 1223 [Checkman]; 1448 [Spangenberg]; 1613-1616, 1621 [Raskin]; 1709-1711, 1736-1737 [Fishbein]; 1792-1793, 1812-1813 [Reimer]; exhibits 14 at iv; 15-16, 60A at 4; 155 at 7; 157 at 7; 255, 289 at 2; 290, 297 at 6; 324, 328.)
The insufficient number of panel attorneys results in the denial of counsel to Family Court litigants. (See, transcript at 893-900 [Spinak]; 98-99 [Law]; 272-273 [Segal, J.]; 710, 717-719, 725 [Córtese]; exhibit 313.) Present and former assigned counsel testified they have reduced or stopped taking assigned cases, as corroborated by judges, administrators and NYCLA’s experts. As of March 2002, for example, approximately 40 attorneys were actively accepting assigned counsel cases in Bronx County (a decrease from 68 in Oct. 1999), and only 25 were actively accepting assigned counsel cases in New York County (a decrease from 75 in Oct. 1999). (See, transcript at 70, 79, 87-88, 99-100 [Law]; exhibitsl5-18, 44A.) Similar reductions were noted in other counties. (See, transcript at 149-153 [Marotta]; 265 [Segal, J.]; 368-369 [Weinberger]; 493-504 [Zimmerman]; 606-608 [Leder]; 657-658 [Drinane]; 785, 816 [Lopez-Torres, J.]; 828-829 [Schiff]; 888-893 [Spinak]; exhibits 14 at iv; 15-44A, 60A at 4; 99-101, 124, 135-144, 157 at 8; 255, 289 at 2; 290, 297 at 6; 310-311.) The adverse consequences of denial of counsel are manifest. The courts are forced to proceed, on a regular basis, without attorneys in domestic violence, foster care placement and review, child protective and juvenile delinquency proceedings. (See, transcript at 541-546 [Greenfield]; 669 [Drinane]; 789-793 [Lopez-Torres, J.]; 834-836 [Schiff]; 893-900 [Spinak]; exhibits 91, 120 at 16; 193, 197 200, 313.) Indeed, under the emergency case system formerly utilized in Family Court, some litigants were not informed of their right to an attorney because of the shortage of assigned counsel. (See, transcript at 684 [Drinane]; 717-719 [Córtese]; 895-896 [Spinak].) In addition, the denial of counsel results in irreparable harm. Litigants have no assistance in preparing their cases, too often resulting in inadequate judicial relief. Domestic violence and family offense victims who file petitions without the aid of counsel often omit crucial information that would permit them to obtain greater protection from the courts, resulting in denied petitions or inadequate relief. Poorly *770 drafted temporary orders of protection may place litigants in physical danger. (See, transcript at 280-281 [Segal, J.]; 319-320 [Gage, J.]; 405-407, 413-415 [Leidholdt]; 547-548 [Greenfield]; 740-751, 754-755 [Susser]; 786-787 [Lopez-Torres, J.]; exhibits Í4-at 22; 91, 120 at 16.) Furthermore, the courts’ ability to function is impaired as judges are not provided with critical and relevant information; and settlement discussions and negotiations cannot occur in the absence of counsel. (See, transcript at 721-726 [Córtese]; 790-791 [Lopez-Torres, J.]; 835-838 [Schiffj; exhibit 91.) The insufficient number of panel attorneys is also evident in permanency hearings. The common practice is that no representation is provided unless the parent knows enough to inform the court of the opposition to the agency’s goals or wants the child returned immediately. (See, transcript at 725 [Córtese].) The lack of representation results in the failure to call experts, make motions or seek discovery, depriving the Family Court judge of basic information to assess whether termination is appropriate or whether other services are required, and results in a less comprehensive order. In addition, parental participation in negotiations or settlement is negligible or nonexistent and time is wasted waiting for attorneys to be assigned. All adversely affect the child. (See, transcript at 720, 728-729 [Córtese].) Moreover, unrepresented litigants place the court in the awkward position of serving as both advocate and arbiter. The victims of domestic violence are usually represented by assigned counsel. However, judges cannot appoint counsel in many domestic violence cases, despite the fact that the statute mandates it, due to the scarcity of assigned counsel. (See, transcript at 793-794 [Lopez-Torres, J.].)
The insufficient number of panel attorneys also results in the frequent delay of Family Court proceedings. As the courts do not have sufficient panel attorneys to assign to litigants at their first, second or third appearance, proceedings in Family Court are frequently adjourned. While adjournments are inherent in any adjudicatory process, those due to lack of panel attorneys are often 8 to 12 weeks in length. Numerous witnesses testified that delays in the assignment of attorneys in Family Court are extensive. (See, transcript at 68 [Law]; 131-132, 158-159 [Marotta]; 201-202 [Dalsimer]; 308-309, 317-319 [Gage, J.]; 405-406 [Leidholdt]; 489-490 [Zimmerman]; 543-546 [Greenfield]; 616-617, 622 [Leder]; 661, 668-669, 678 [Drinane]; 720 [Córtese]; 771-773 [Lopez-Torres, J.]; 893, 900-907 [Spinak]; exhibits 14 at 16; 85 at 46; 120, 124 at 17; 149 at 18-19; 154, *771 290, 297 at 7-8.) These delays result in severe and irreparable harm: no representation during critical periods, often where due process rights to liberty and care for children are at stake. Immediate court intervention is required in many of these cases, including abuse and neglect or child protective cases that concern the removal of a child from the home, juvenile delinquency cases where juveniles are held in custody, and domestic violence cases where victims’ personal safety is at risk. (See, transcript at 900, 903-907 [Spinak]; exhibits 14, 120, 124, 297 at 8.) Children have been found to be removed from parents’ custody at ex parte hearings where they were unrepresented. (See, transcript at 475-477 [Zimmerman]; exhibit 124 at 22.) However, because no counsel are available parents often do not receive a timely 1028 hearing in abuse and neglect or child protective proceedings. The court’s role at these proceedings is to insure that the state agency is not overreaching. As a result, these parents may lose custody of their children for long periods of time with an inadequate judicial assessment of whether the removal is warranted. Many witnesses testified that parents are less likely to receive a favorable final determination on the merits where their children are removed for long periods. (See, transcript at 66-68 [Law]; 202-205 [Dalsimer]; 270-271, 278-279 [Segal, J.]; 306 [Gage, J.]; 549 [Greenfield]; 619-620 [Leder]; 644-652 [Drinane].)
Delays continue despite New York’s enactment of the Adoption and Safe Families Act (ASFA), which imposes strict time frames with the goal of achieving permanency for children and families in child protective proceedings. Children continue to be removed from parents and languish in foster care for long periods because of continuous adjournments to find counsel. An improper removal may result in long periods of time in foster care and trauma from the lengthy separation from parents and siblings. The parents, of course, are denied liberty rights to care for their children. (See, transcript at 159-160 [Marotta]; 202-203 [Dalsimer]; 271, 279 [Segal, J.]; 318 [Gage, J.]; 647-651, 664-668, 679 [Drinane].) In fact, under ASFA, the court must conduct a permanency hearing to determine if a child should be permanently removed from a parent’s care within 12 to 14 months of the child’s removal, and decide whether to order the agency to begin a termination of parental rights (TPR) proceeding within 15 to 22 months of the removal. Lengthy adjournments harm parents’ abilities to obtain the return of their children and increase the likelihood that a TPR proceed *772 ing will be filed. (See, transcript at 903-907 [Spinak]; exhibits 14, 124 at 23.) Fact-finding hearings currently take an average of seven months. Because of lengthy adjournments, permanency hearings under ASFA often occur before the fact-finding proceedings and final determination of the original abuse or neglect proceeding that led to the child’s removal. (See, transcript at 320-322 [Gage, J.]; 649-652 [Drinane]; 706-707, 720-721 [Córtese]; 905-907 [Spinak]; exhibits 77, 124 at 15-16.) Where parents or other parties are not represented by counsel, the needs of the children, parents and the family cannot be addressed by the courts on a timely basis. The courts and other parties cannot obtain critical information about children and parents’ needs. As a result, courts cannot address certain issues, such as visitation or social services, that need immediate attention. (See, transcript at 270, 278-279 [Segal, J.]; 490-491 [Zimmerman]; 548-549 [Greenfield]; 621-622 [Leder]; 665-667 [Drinane]; 719-720 [Córtese]; 845 [Schiffl; 904-905 [Spinak].) Parents are denied visitation rights for long periods of time while the court attempts to find assigned counsel to represent them in custody, visitation, and abuse and neglect cases. As a result, parents are “deprived of an opportunity to have a relationship with their child, and the child is * * * deprived of an ability to have a relationship with their parent.” (See, transcript at 490 [Zimmerman]; see also, transcript at 203-205 [Dalsimer]; 620-621, 623-624 [Leder].)
In delinquency proceedings, juveniles may lose their liberty interest if counsel are not promptly assigned. Children who are not represented at probable cause hearings are remanded to the custody of a state detention facility. (See, transcript at 299 [Gage, J.]; 477-478 [Zimmerman]; 658-660, 671-672 [Drinane]; 773-774 [Susser]; 834-838 [Schiffl; 903 [Spinak]; exhibit 14 at 22.) In addition, juveniles are released from custody without the statutorily required evaluation of whether they are likely to commit another offense, placing the community at risk. (See, transcript at 268-269, 279 [Segal, J.]; 306 [Gage, J.]; 790 [Lopez-Torres, J.].)
The lack of panel attorneys also results in delay of criminal court actions. There are not enough assigned counsel who are willing and available to staff the Arraignment Parts in the New York City criminal courts. (See, transcript at 576-579, 581-582 [Milano]; 1083-1085 [Mogulescu, J.]; 1144-1145 [Cohen]; 1269-1274 [Farrell]; 1448-1450 [Spangenberg]; 1621 [Raskin]; 1710-1711, 1715-1720 [Fishbein]; 1798-1803 [Reimer]; 1936-1937 [Becker]; 2362-2363 [Angioletti]; exhibits 120 *773 at 14-15; 124 at 21; 155 at 7; 193-194, 290, 297 at 6-7; 322-323, 330 7-11; exhibit 1-1.) This often results in assignment of counsel who represent defendants for the purposes of the arraignment only. Hence the term “arraignment only” attorney. These defendants, in effect, are not represented during the critical five- to six-day period between their arraignment and their “180.80 day.”[8] There is, as a result, a substantial risk they will be denied any meaningful opportunity to consult with an attorney concerning his crucial decision to testify before the grand jury or to negotiate a plea offer to a lesser offense before an indictment. (See, transcript at 575-576, 585-591 [Milano]; 1082-1083, 1085, 1088-1089, 1094-1098 [Mogulescu, J.]; 1269-1275 [Farrell]; 2374-2377 [Angioletti]; exhibit 330 11.) In addition, litigants are denied counsel for grand jury representation on felony complaints. (Transcript at 1096-1097 [Mogulescu]; 1274-1276 [Farrell]; 1329-1330 [Pickholz]; 2374-2378 [Angioletti].)
There are not enough skilled and experienced assigned counsel willing to represent defendants in homicide and serious felony cases, thereby causing delay. (See, transcript at 50 [Firetog, J.]; 587-588 [Milano]; 967, 969 [Collins, J.]; 1082, 1103, 1117 [Mogulescu, J.]; 1711 [Fishbein]; 1797-1798 [Reimer]; exhibit 120.) Murder trials are delayed. Assigned counsel today represent the vast majority of indigent defendants charged with homicides in New York City. (See, transcript at 22-23, 49-50 [Firetog, J.]; 969 [Collins, J.]; exhibits 104-105.) Although higher rates are paid to attorneys representing defendants in capital cases, standard rates are paid where the death penalty is not sought or available.
Currently, the high workloads undertaken by assigned counsel do not provide them with the time necessary to devote to each case. They do not perform the necessary out-of-court work because the majority of their time is spent in court. The few active Family Court panel attorneys who accept intake shift assignments undertake a disproportionate share of cases. If there is only one attorney staffing an intake shift, he may be responsible for picking up as many as 25 to 30 new cases in one day. Many of these cases may require substantial amounts of work that must be immediately performed, such as prepara *774 tion for a 1028 hearing in an abuse and neglect case, or a probable cause hearing in a juvenile delinquency case, both of which must be conducted within three days. As a result of their higher case loads and workloads, these attorneys are not able to properly prepare for these critical hearings. (See, transcript at 66-67, 72-73, 94-95 [Law]; 133-135 [Marotta]; 266 [Segal, J.]; 368-369 [Weinberger]; 467-469, 485 [Zimmerman]; exhibit 297 at 7.) Similarly, higher case loads and workloads affect performance in criminal cases. (See, transcript at 966-967, 977-978 [Collins]; 1138-1139 [Cohen]; 1447-1449, 1524-1525 [Spangenberg]; 1793-1795 [Reimer]; cf. NY City exhibit D; N.S. exhibit KKK.)
The insufficient number of assigned counsel in the Family Court has resulted in less than meaningful and effective assistance of counsel. The testimony of experts, judges and experienced attorneys in Family Court showed that because of the rate levels assigned counsel do not interview clients; consult with them on a regular basis throughout the proceedings; review all relevant records and documents; perform an independent investigation of the facts and the law; identify and interview witnesses; file motions, conduct discovery and follow up on appropriate discovery requests; make applications for investigators or other experts where appropriate; prepare for a negotiated settlement or litigation at each stage of the proceedings; ensure that clients receive necessary services and prepare appropriate service plans; secure appropriate orders, and monitor compliance. The lower rate paid for out-of-court time, in particular, operates as a substantial disincentive to perform many of these tasks. (See, transcript at 217 [Dalsimer]; 919-925, 932 [Spinak]; 1664-1666 [Lefstein]); exhibits 14, 53, 124, 156 at 6; 157 at 6; 312.)
The shortage of assigned counsel in the criminal courts, as in the Family Court, has also resulted in less than meaningful and effective assistance of counsel. Too many assigned counsel do riot conduct a prompt and thorough interview of the defendant; consult with the defendant on a regular basis; examine the legal sufficiency of the complaint or indictment; seek the defendant’s prompt pretrial release; retain investigators, social workers or other experts where appropriate; file pretrial motions where appropriate; fully advise the defendant regarding any plea and only after conducting an investigation of the law and facts; prepare for trial and court appearances; and engage in appropriate presentencing advocacy, including seeking to obtain the defendant’s entry into any appropriate diversionary *775 programs. (See, transcript at 30-31 [Firetog, J.]; 1090-1091, 1057-1061 Yates, J.]; 1105-1107 [Mogulescu, J.]; 1180, 1183 [Loving]; 1327 [Pickholz, J.]; 1421-1427 [Spangenberg]; 1617-1618 [Raskin]; 1634-1635, 1647-1654 [Lefstein]; 1728-1729 [Fishbein]; 2340-2341 [Angioletti]; exhibits 263 [ABA Criminal Justice Standards], standards 4.3-2 [a], 4.1 [a], 6.1, 7.9; 264, 265 [NLADA Performance Guidelines for Criminal Defense Representation], guideline 4.1; 267-268.) In addition, the evidence showed that many attorneys do not conduct appropriate investigations of the facts or the law, and of those that do, many fail to do so prior to engaging in plea negotiations and only do so immediately prior to trial. (See, transcript at 1053-1055 Yates, J.]; 1180-1182 [Loving]; 1318-1324 [Pickholz, J.]; 1728-1729 [Fishbein].) Many do not file meaningful pretrial motions. (See, transcript at 1044-1046 Yates, J.]; 1107-1110 [Mogulescu, J.]; 1728-1729 [Fishbein].)
The evidence revealed many assigned counsel do not prepare motions or memoranda and do not have sufficient contact with clients in a conducive atmosphere because they cannot afford the basic tools of the trade: offices to meet with clients, traditional research materials, on-line research capability, paralegals, and secretaries or receptionists. (Transcript at 370-371 [Weinberger]; 827-830 [Schiff]; 1158-1159 [Cohen]; 1401, 1413, 1420, 1491 [Spangenberg]; 1814 [Reimer].)
The present statutory compensation rates and the deficiencies in the assigned counsel system resulting therefrom have seriously impaired the courts’ ability to function. There are an insufficient number of attorneys to assign to litigants who are entitled to legal representation in Family Court and criminal proceedings. This critical shortage has resulted in judges leaving the bench or engaging their law clerks, court attorneys, court clerks, or court officers to scour the courthouse hallways to find attorneys willing to accept cases. The testimony revealed judges must cajole, urge and even beg assigned counsel to take cases. Many times these efforts were not successful. In the meantime, cases grind to a halt. (See, transcript at 67 [Law]; 131 [Marotta]; 261, 271-272 [Segal, J.]; 470-473 [Zimmerman]; 578-579 [Milano]; 788-790, 792 [Lopez-Torres, J.]; 832-833 [Schiff]; exhibit 124 at 21.) If a willing and available assigned counsel cannot be found, the judge must proceed without counsel or adjourn the case, both to the detriment of the litigants and the court. (See, transcript at 131-132 [Marotta]; 306 [Gage, J.]; 789, 794, 808-809 [Lopez-Torres, J.]; 1935-1936 [Becker]; exhibits 60A at 4; 120 at 14-15; 124 at 21; *776 154, 290, 297.) In addition, judges are unable to process cases in a timely fashion. This shortage results in repeated adjournments, significant delays of trials and other court proceedings, farther resulting in substantial backlogs of pending cases. (See, transcript at 21 [Firetog, J.]; 278 [Segal, J.]; 307-309 [Gage, J.]; 772 [Süsser]; 965-967, 989 [Collins, J.]; 1120 [Mogulescu, J.]; 1459 [Spangenberg]; 1818 [Reimer]; exhibits 120, 154, 297 at 7-8.) Furthermore, the adversary system is compromised. Judges must therefore decide cases with little, or in some cases no;,assistance from counsel. As one witness testified: “It affects your ability to accord * * * due process of law. The consequences are monumental to the families, to the children and to the court system.” (See, transcript at 809 [Lopez-Torres, J.]; see also, transcript at 277-278 [Segal, J.]; 306, 315-317 [Gage, J.]; 665-667 [Drinane]; 719 [Córtese]; 808, 815-816 [Lopez-Torres, J.]; exhibits 86, at 35; 154.)
The current statutory rates are the cause of assigned counsel shortages. Numerous attorneys testified that they have stopped accepting assigned counsel cases or reduced the number of cases they accept because the statutory rates are inadequate. (See, transcript at 125-126, 141-142, 183 [Marotta]; 193-194, 214 [Dalsimer]; 829 [Schiff]; 1131-1133, 1143, 1145 [Cohen]; 1207, 1209 [Michaels]; 1225 [Checkman]; 1299 [Walter]; 1615-1616 [Raskin]; 1817-1823 [Reimer]; exhibits 120, 124 at 18-19; 289 at 2.) Assigned counsel administrators and judges also testified that these shortages of active assigned counsel have been directly caused by the rates. (See, transcript at 94 [Law]; 311 [Gage, J.]; 353 [Weinberger]; 978 [Collins, J.]; 1793, 1800-1802, 1808-1813, 1815, 1841 [Reimer]; exhibits 14 at iv; 60B at 3; 120, 124, 324.) Plaintiff’s experts concluded that the shortages of active assigned counsel have been directly caused by the rates. (See, transcript at 909 [Spinak]; 1412 [Spangenberg]; 1657-1658 [Lefstein].) Witnesses also testified that more experienced panel attorneys, in particular, have stopped accepting assigned counsel cases or have reduced the number of cases they accept because the statutory rates are inadequate. (See, transcript at 26-27 [Firetog, J.]; 79-80 [Law]; 125-126, 132, 135-136 [Marotta]; 215-216 [Dalsimer]; 828 [Schiffl; 1029-1030 [Yates, J.]; 1131-1133 [Cohen]; 1225, 1241-1242 [Check-man]; 1258 [Farrell]; 1613-1618 [Raskin]; 1710, 1736-1737 [Fishbein]; 1793, 1800-1802, 1812-1813 [Reimer]; exhibits 60A at 4; 120 at 13, 16; 124 at 18-19; 289 at 2; 297 at 7; 324.) Furthermore, on June 12, 2002, the Commissioner of the New York State Division of Criminal Justice Services (DCJS) stated *777 that the rates were extremely low and that the difficulty being faced was the funding source. The statement was made at a meeting in Albany attended by Justice Edward O. Spain, as chairperson of the New York State Law Guardian Advisory Committee, the Law Guardian Directors of the four Judicial Departments, representatives from Senator Joseph L. Bruno’s office, representatives from Assemblyman Sheldon Silver’s office and counsel for DCJS. (See, transcript at 378-379 [Weinberger].)
The evidence shows that out-of-court assigned counsel work requires no less legal skill and effort than work performed in court and is as important, if not more so, to the quality of representation. Assigned counsel maximize their in-court time at the higher rate in order to financially survive. (See, transcript at 485 [Zimmerman]; 1138 [Cohen]; 1188-1190 [Loving]; 1234 [Checkman]; 1664-1666 [Lefstein]; 1794-1795 [Reamer]; 2344-2345, 2368-2369 [Angioletti]; exhibits 124 at 19-20; 297 at 7; 330 13.) The lower rate operates as a disincentive to perform necessary out-of-court work. The lower out-of-court rate, accordingly, results in a threat of irreparable harm to litigants. The evidence further showed that assigned counsel would perform necessary out-of-court work if compensated at the in-court rate. (See, transcript at 217 [Dalsimer]; 491-492 [Zimmerman]; 846-847 [Schiffl; 1190-1191 [Loving]; 2351, 2378-2379 [Angioletti]; exhibit 330 fl 27.)
The removal of the caps on total per case compensation is necessary to assure meaningful and effective representation. (See, transcript at 607-608 [Leder]; 1206-1207, 1209 [Michaels]; 1240-1241 [Checkman]; 1261 [Farrell]; 1298-1299 [Walter]; 1615 [Raskin]; 1657, 1666-1667 [Lefstein].) There are too many cases where
“[u]nder the current statutory provisions governing payment for such representation, it seems then that any attorney who fulfills his/her ethical obligations must be prepared to exceed the $1200 cap in most felony cases which are not disposed of by an early plea of guilty.
“Accordingly, counsel in these cases routinely submit vouchers seeking payment for the actual time that they have expended on the case. It is simply inconceivable to this Court that all (or even most) of these cases manifest extraordinary circumstances involving the underlying facts, the defendant or anything else. However, the ‘system’ has *778 routinely ignored the cap and paid the amount requested — perhaps out of a sense of fairness and/or embarrassment at the fact that New York State is at the very bottom of the fifty states in .compensation to assigned counsel in criminal cases.” (People v Thompson, NYLJ, Jan. 23, 2003, at 21, col 2 [Sup Ct, Bronx County].)
This court concludes, beyond a reasonable doubt,[9] that those portions of section 722-b of the County Law, section 245 of the Family Court Act and section 35 of the Judiciary Law that relate to assigned counsel compensation rates are unconstitutional as applied, as they violate the constitutional and statutory right to legal representation of children and indigent adults in New York City Family and Criminal Courts, and result in a constitutional imbalance among the branches of government impairing the judiciary’s ability to function. Therefore, this court issues a mandatory permanent injunction and directs assigned counsel be paid $90 an hour without distinction between in- and out-of-court work, and without ceilings on total per case compensation, until the Legislature acts to address the issue.
This court recognizes it does not have the capacity or the resources, nor is it in the best position to provide a comprehensive, although interim, solution to the present crisis. However, it does so with limited judicial precision and minimal intrusion into the executive and Legislature’s province albeit justified by surrender of their constitutional obligations. The expenditure of funds for the purpose of indigent defense and the manner by which it is provided is a complex societal, political, economic and governmental issue best left to the executive and legislative branches. They are in a better position to investigate, hold hearings, formulate, debate, identify funding sources and provide, if at all, governmental incentives, such as tax deductions or credits, and structure a plan of rates with or without caps or differentials, to best meet the needs of the assigned counsel scheme. Implicit in the State’s obligation to provide reasonable compensation to assigned counsel is the recognition that legal assistance, like any provision or distribution of goods and services over time, is subject to the dynamics of inflation and the laws of supply and demand. The failure of the Legislature to address the rates since 1986 ignores these realities.
*779 The indigent’s right to appointed counsel was imposed on the states by hammer and chisel (see, US Const Amend VI; NY Const, art I, § 6; Gideon v Wainwright, 372 US 335 [1963]) and is now widely understood to mean that defendants are entitled to meaningful and effective legal representation at every critical stage of a proceeding. (See, McMann v Richardson, 397 US 759, 771 n 14 [1970]; People v Baldi, 54 NY2d 137, 146-147 [1981].) New York has historically been concerned with the need for counsel, expanding its application in many proceedings, arguably but not directly required by the United States Constitution. In so doing, the Legislature expressly recognized the importance of an attorney in Family Court proceedings, holding the appointment of counsel essential to secure due process. (See, Family Ct Act § 261.)[10] Family Court litigants, like the accused in criminal cases, are entitled to the assistance of counsel that is meaningful and effective. The statutory right to counsel under Family Court Act § 262 affords protections equivalent to the constitutional standard of meaningful and effective assistance of counsel afforded defendants in criminal proceedings. (Matter of Thompson v Jones, 253 AD2d 989, 989-990 [3d Dept 1998]; Matter of Erin G., 139 AD2d 737, 739 [2d Dept 1988].) In Family Court, meaningful and effective assistance requires that attorneys accomplish certain basic tasks in all cases. Attorneys must thoroughly interview and counsel their clients. (See, Matter of James R., 238 AD2d 962 [4th Dept 1997] [reversal where attorney did not meet with respondent mother and did not inform her of need to appear at fact-finding].) They must conduct an independent investigation and develop evidence. (See, Matter of Colleen CC., 232 AD2d 787, 788 [3d Dept 1996] [reversal where law guardian failed to develop evidence on behalf of his client].) They must also adequately prepare for and actively participate in proceedings at each stage of a case. (See, Matter of Jamie TT., 191 AD2d 132, 136-137 [1993] [reversal where law guardian called no witnesses and conducted perfunctory cross-examination]; Matter of Elizabeth R., 155 AD2d 666 [1989] [2d Dept 1990] [reversal where law guardian was not an active participant in the proceedings]; Matter of Bernard K., 280 AD2d 728, 729 [3d Dept 2001] [“totality of the circumstances demonstrates that *780 respondent received meaningful representation” and citing criminal precedent, including People v Rivera (71 NY2d 705, 709 [1988]), to define effective assistance].)
' The assigned counsel plan is part of the infrastructure created by the City of New York in response to the State’s mandate to devise a plan which provides legal representation to indigent litigants. The system operates because attorneys choose to uphold their oath, undertake the obligation to test the adversarial process and bring to bear such skill and knowledge'- ds will render the outcome reliable. In return, the State assumés the obligation to provide assigned counsel with a reasonable basis upon which they can carry out their profession’s responsibility, without either personal profiteering or undue financial sacrifice. The current rates threaten the adversarial process by creating an unacceptable tension between adherence to professional standards and the financial burden an attorney assumes when serving on an 18-B panel. The State argues it is the City’s excessive reliance[11] on 18-B counsel that is responsible for the crisis, not the current compensation rates. New York City remains manifestly dependent on the assigned counsel plan to function, and as a result there will always be a class of indigent citizens who are assigned 18-B counsel and who ultimately will be at substantial risk of being provided less than meaningful and effective representation because of the current rates.
NYCLA has prevailed on its claim of prospective ineffective assistance of counsel. NYCLA has established the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law.[12]
*781 NYCLA has also established the claims of denial of due process. Specifically, Family Court litigants are denied mandated hearings and the timely assignment of counsel. Criminal court defendants charged by felony complaint are assigned attorneys for arraignment only; this impedes a defendant’s statutory rights pursuant to CPL 190.50.
Due process includes the right to timely assignment of counsel. In juvenile delinquency proceedings, for example, “[T]he child ‘requires the guiding hand of counsel at every step in the proceedings against him.’ ” (In re Gault, 387 US-1, 36 [1967].) When a person entitled to counsel “first appears in court, the judge shall advise such person before proceeding that he has the right to be represented by counsel ** * * and of his right to have counsel assigned by the court in any case where he is financially unable to obtain the same.” (Family Ct Act §262 [a] [emphasis added].) The Court of Appeals has interpreted section 262 to confer the right to “the assistance of counsel throughout the Family Court proceeding.” (Matter of Alexander L., 60 NY2d 329, 336 [1983].)[13] In criminal proceedings, “the * * * right to counsel attaches indelibly * * * when formal judicial proceedings begin [at arraignment] * * * [or] when an uncharged individual has actually retained a lawyer in the matter at issue or, while in custody, has requested a lawyer in that matter.” (People v Ramos, 99 NY2d 27, 32 [2002] [internal quotation marks and citations omitted].) The judicial function commences with the filing of an accusatory instrument against a defendant in a local criminal court. (CPL 1.20 [16].) Within a reasonable time after a warrantless arrest the detainee must be brought before a local criminal court judge to be arraigned. (CPL 140.20.) Arraignment is a material stage in the prosecution of an alleged offense. Generally, it is the pro *782 cess of bringing a defendant before the court, the People officially serve notice of the charges underlying the arrest (CPL 1.20 [9]), and in the case of an indigent, the court assigning counsel (CPL 170.10 [1], [2], [3]) and a return date is selected. In the case of a felony complaint, the defendant is given grand jury notices. (CPL 180.10, 190.50 [5] [a].)
The phenomenon of the “arraignment only” attorney is a creation of an overburdened system that affects a class of indigent defendants charged by felony complaint who may be assigned counsel who are only able to represent them for this purpose. New York considers the grand jury process a critical stage in the proceeding entitling defendants to meaningful representation. (People v Wiggins, 89 NY2d 872 [1996]; People v Pressley, 94 NY2d 935, 937 [2000].)[14] There is, as a result, an actual risk that they will be denied any meaningful opportunities to consult with counsel concerning testifying before the grand jury. (CPL 190.50.) Attorneys testified that where a case is handled by an attorney for “arraignment only,” the defendant has little or no opportunity to consult with counsel concerning his crucial decision to testify before the grand jury.
There is a failure to timely assign counsel at permanency hearings and domestic violence cases. Because children were languishing in the foster care system and in response to federal legislation, New York State in 1999 adopted its own version of the Federal Adoption and Safe Families Act which imposed strict time frames on state foster care agencies with the goal of achieving permanency for children and families. A “permanency hearing” is the periodic review of a child’s foster care status with the ultimate aim of achieving a permanent home. State law requires termination of parental rights after a child remains in foster care for an extended period. JRD represents the child; assigned counsel usually represents the foster parent, the respondent parent, and an intervening relative, if any. According to the evidence, parents rarely obtain attorneys for permanency hearings. The common practice is for parents not to be represented because there are not enough assigned counsel to accommodate the need.
Parents do not receive representation at 1028 hearings. Pursuant to Family Court Act § 1028, upon the request of a parent *783 whose children have been removed on allegations that the home poses a threat to the life and health of the child, a hearing is mandated within three days. This section instructs the court to grant the application to return the child to the custody of the parent unless it finds that “return presents an imminent risk to the child’s life or health.” (Family Ct Act § 1028 [a].) The evidence demonstrates assigned counsel are routinely not provided because of an insufficient number to accommodate the need. This is true of domestic violence cases as well.[15] Judge Weinstein’s decision in Nicholson v Williams (203 F Supp 2d 153, 256 [ED NY 2002]) recognized the constitutional infirmity as it relates to this category of Family Court litigants. The evidence at trial did not demonstrate that the State has made any efforts to remedy the problem.
There is uncontroverted evidence of material and actual constitutional injury to litigants in Family and Criminal Court proceedings in New York City: many litigants in Family Court proceedings are denied any assistance of counsel; litigants suffer severe and irreparable harm when they are unrepresented during critical periods of the proceedings where their liberty and due process rights are at stake, because no assigned counsel can be found to represent them. Moreover, NYCLA proved that these constitutional injuries, and this threat of irreparable constitutional harm to these litigants, are the direct result of the current statutory rates of compensation and caps.
The proof is sufficient to warrant permanent injunctive and declaratory relief under New York law. (See, New York County Lawyers’ Assn. v State of New York, supra, 294 AD2d at 74, citing Swinton, supra, 93 NY2d at 765-766, and Luckey v Harris, 860 F2d at 1017.) The statutory rates result in a real and immediate threat that these litigants will be, and are being, denied their constitutional rights to the meaningful and effective assistance of counsel and due process of law. (See, Niagara Recycling v Town of Niagara, 83 AD2d 316, 332-333 [4th Dept 1981]; Tucker v Toia, 54 AD2d 322, 325 [4th Dept 1976].)
The injuries these litigants suffer are irreparable because of the nature and consequences of the ongoing Family and Crimi *784 nal Court proceedings at issue. These litigants suffer irreparable constitutional harm when they are denied their rights to counsel, when they are unrepresented during critical periods of their proceedings where their due process and liberty rights are at stake because no assigned counsel are available to represent them, when they are represented by overburdened and inattentive assigned counsel who fail to, or are unable to, perform the basic tasks necessary to provide meaningful and effective representation, and when they must endure prolonged delays in Family and Criminal Court proceedings. (New York County Lawyers’ Assn. v State of New York, supra, 192 Misc 2d at 433.) This is precisely the type of irreparable harm that supports prospective injunctive relief. (See, New York County Lawyers’ Assn. v State of New York, supra, 294 AD2d at 74; see also, Luckey v Harris, supra, 860 F2d at 1017 [plaintiffs required to show “likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law”].)
In balancing the equities, this court is mindful of the past conduct of the State and City who have for many years ignored New York City’s assigned counsel crisis. (See, Brad H. v City of New York, 185 Misc 2d 420, 431 [Sup Ct, NY County 2000], affd 276 AD2d 440 [1st Dept 2000].) This court recognizes that indigent citizens do not represent a substantial lobby in Albany. However, at the cornerstone of our system of justice is the precept that all citizens will be treated equally under the law. This court has shown substantial deference to the Legislature, awaiting legislation. Under these circumstances, equity can only be served by intervention to protect the fundamental constitutional rights of children and indigent adults who face present and future irreparable deprivations of these rights if injunctive relief is denied. The magnitude of the problem is evidenced by the bellowing cries for reform sounding for years from every corner of the New York legal community. The executive branch has also recognized the inadequacy of the rates and the failure to provide an increase for 17 years.[16]
A permanent injunction is warranted. The evidence established that a rate of $90 an hour would make a sufficient *785 number of assigned counsel available to provide meaningful and effective assistance to their clients, and the judiciary’s ability to function will be improved. This court will not attempt to micromanage with piecemeal injunctive relief by imposing different rates in different types of cases. Such an attempt would likely worsen the assigned counsel crisis in some parts of New York City and would create an administrative quagmire. A uniform rate addresses the assigned counsel crisis without disturbing the existing administrative process.
This court’s conclusion that an assigned counsel rate of $90 an hour without a ceiling on total per case compensation or a distinction between in- and out-of-court work is reasonable compensation for all criminal actions and family proceedings in New York City is based upon: (1) the $90 federal assigned counsel rate; (2) the $90 rate set by the United States District Court in the New York City family class action case — Nicholson; (3) the convincing testimony of NYCLA’s experts and witnesses; (4) Chief Judge Judith S. Kaye’s proposed $75 and $60 rate three years ago; and (5) the 17 years since the Legislature last addressed the issue.
The Federal District Courts for the Southern and Eastern Districts of New York currently compensate attorneys in criminal cases at a rate of $90 per hour. {See, 18 USC § 3006.) The testimony established that attorneys’ work in state courts requires more preparation and skill, yet the rates paid for assigned counsel work in the federal courts is substantially higher. Neil Checkman, Esq. testified that if the state and federal rates were equal, he would take substantially more state cases. He testified that because of federal sentencing guidelines and the vast amount of federal prosecutorial resources, there is a greater likelihood that a defendant will plead guilty in federal court. He has a greater ability to be effective in state court, where cases are more likely to proceed to trial. {See, transcript at 1243-1249.) Joel Walter, Esq. testified that more skill was required when representing a defendant in state court as opposed to federal court. He stated that by the time clients are assigned in federal court, the case against the defendant has been thoroughly investigated by the prosecution, witnesses have been found and there usually are incriminating telephone conversations and videotape. He contrasted the cases in state court where the crimes are generally spontaneous, the investigations are not lengthy and there is much more preparation and expertise required. {See, transcript at 1302-1304; see also, transcript at 1830-1835 [Reimer]; 2345 [Angioletti].) This testimony was not rebutted by the State.
*786 United States Eastern District Judge Jack B. Weinstein considered that an hourly rate of $90 per hour “may be too low, particularly in New York City where attorneys’ overhead and fees are exceptionally high.” (Nicholson v Williams, supra, 203 F Supp 2d 153, 259 [ED NY 2002].) Judge Weinstein fixed that rate to err “on the side of caution in interfering with state affairs.” (Id. at 259-260.) The “court received extensive evidence regarding the minimum appropriate compensation necessary to repair the 18-B system and ensure adequate representation to the indigents it serves.” (Id. at 259.) “The Judicial Conference of the United States has recommended that a rate of $113 per hour be paid to counsel appointed in federal criminal cases. Report of the Proceedings of the Judicial Conference of the United States, September 19, 2000 [at] 50 (recommending a compensation rate of $113 per hour in-court and out-of-court for federal non-death penalty cases; death penalty cases have a higher rate).” {Id.) The Judicial Conference found that the then-current “hourly rates [of $75] [were] too low to recruit and retain a sufficient number of qualified and experienced counsel to accept CJA appointments and to provide a fair rate of pay.” Judge Weinstein also noted that a $100 per hour rate would be appropriate in New York City. (See, Nicholson v Williams, supra, 203 F Supp 2d at 259-260 [ED NY 2002] [quoting Professor Lefstein’s recommendation that the “rate of compensation for assigned counsel should be at least $90 (per hour)” and stating that a “rate of $90 per hour may be too low, particularly in New York City where attorneys’ overhead and fees are exceptionally high * * *”].)
Professor Norman Lefstein, NYCLA’s expert, testified that “the rate of compensation ought to be, at least $100 an hour. I hasten to add, however that I still regard that as a discounted rate.” {See, transcript at 1673.) The amounts paid to panel attorneys are insufficient to cover even normal hourly overhead expenses. The trial testimony established that the median overhead expenses for solo practitioners for 1995 was $40,000 in New York City while the average amount was $51,650. {See, transcript at 1569-1572 [Stiffman].) Multiplying $40,000 by 1.34, the inflation factor testified to by Dr. Stiffman, yields the sum of $53,600 as the median for 2002 and multiplying $51,650 by 1.34 yields $69,211 as the average for 2002. Dividing these numbers by 2000, the number of hours in a “normal” 40-hour workweek divided by 50 weeks per year, yields $26.80 per hour as the median and $34.60 per hour as the average amount of overhead expenses. Dr. Stiffman applied a more precise method *787 whereby he calculated the overhead costs based upon billable hours rather than “normal” workweeks, and the amount he derived was $42.88 as the overhead rate per billable hour for solo practitioners in New York City. (See, transcript at 1579.) This testimony establishes that most members on the 18-B panels would lose between $2.88 and $17.88 per hour if they continue to work at the current rates. There is credible testimony that overhead expenses are more than $72,000 per year for attorneys on the 18-B panel. (See, transcript at 1301 [Walter].) There is also credible testimony that a firm of two lawyers has overhead of between $84,000 and $96,000 per year. (See, transcript at 1133 [Cohen].) There is other evidence which establishes that overhead may be as high as $125,000 per year. (See, transcript at 1615 [Raskin].) Dividing $125,000 by 40 hours per week by 50 weeks per year establishes that the cost for overhead for such an attorney would be $62.50 per hour. In addition, attorneys on the 18-B panel may pay $25 per hour for secretarial services. (See, transcript at 459 [Zimmerman]; 1299 [Walter].) There is also credible testimony that attorneys would be able to operate more efficiently if the rates were higher, by utilizing the services of paralegals to perform the work that the attorneys are now performing. (See, transcript at 148 [Marotta].) Other professionals, some with perhaps less training, education and overhead expenses than lawyers on the 18-B panels, receive higher rates of compensation. Social workers receive $45 per hour, psychologists receive $90 per hour, psychiatrists receive $125 per hour, physicians receive $200 per hour, and investigators receive $32 per hour. (See, transcript at 1782 [Reimer]; exhibit 119 at appended exhibit B.) Moreover, NYCLA’s evidence demonstrated that assigned counsel must have access to the basic “tools of the lawyer’s trade.” Indeed, assigned counsel in the First Department are required to have offices. (Transcript at 370-371 [Weinberger].) Because these resources are necessary to permit assigned counsel routinely and consistently to provide meaningful and effective representation to their clients, the interim rate must be sufficient to permit them to afford these resources. (See, Mahoney v Pataki, 98 NY2d 45, 53 [2002] [upholding Court’s approval of capital fee schedule that includes provision for reasonably necessary legal and paralegal assistance as reasonable exercise of discretion].) The $90 per hour rate will enable the panel attorneys to pay overhead and earn a reasonable income. The testimony established that when the rate is insufficient to cover overhead and provide a profit, attorneys refuse to take *788 cases. (See, transcript at 540 [Greenfield]; 830 [Schifi]; 1209 [Michaels]; 1659 [Lefstein]; 1145 [Cohen]; 1228 [Checkman]; 1260-1261 [Farrell]; 1299 [Walter]; 2378 [Angioletti].) The burden on assigned counsel to perform at the low rates is demonstrated to be “crushing.” (See, transcript at 1820-1821 [Reimer].) Finally, the legislative history of article 18-B makes it clear that the statutory rates of compensation were intended to provide assigned counsel with a “reasonable” hourly rate of compensation and a “reasonable basis upon which [they] could carry out their profession’s responsibility to accept court appointments, without either personal profiteering or undue financial sacrifice.” (New York County Lawyers’ Assn. v State of New York, supra, 192 Misc 2d at 434.)
The State presented evidence attempting to establish that a lower rate than that sought by plaintiff would suffice to resolve the crisis. This court considered the testimony of the State’s expert, William Carrington, Ph.D., concerning overhead and an hourly rate which he felt would attract a sufficient number of attorneys to the 18-B panels, but finds the testimony of NYCLA’s expert witnesses, Dr. Stiffman and Professor Lefstein, more compelling on both issues. The analysis by Dr. Carrington included a different method of calculation with respect to overhead than that used by NYCLA’s experts. (See, transcript at 2283-2294.) Specifically, he determined that many 18-B attorneys should allocate overhead expenses primarily to their private practice, but he did not provide a rational basis for this analysis. (See, transcript at 2287.) He failed to provide evidence that expenses such as rent, photocopying, and secretarial services are cheaper when doing private work as opposed to 18-B work. Dr. Carrington testified that a “blended rate,” for both in- and out-of-court work, of approximately $56 per hour would be “equivalent to the blended rate that prevailed in 1986.” (See, transcript at 2262.) He rejected the findings of the Altman-Weil Survey of Law Firm Economics without providing an adequate basis for such rejection. (See, transcript at 2321.) He failed to consider that overhead in New York City is considerably higher than the average overhead costs throughout the country, and his findings, which are quite different from those presented by NYCLA’s witnesses, are rejected. This court also finds that NYCLA’s expert witnesses, Dr. Stiffman and Professor Lefstein, had substantially more relevant experience than Dr. Carrington and credits their testimony over his for this additional reason.
The distinction between compensation for in-court work versus out-of-court work creates an economic disincentive for *789 lawyers to perform adequate investigations and seek speedy disposition of all cases despite the particular facts. The more time a lawyer spends on a case, the greater will be his negative cash flow. Eliminating the distinction will permit panel attorneys to perform needed work without incurring a financial burden. (See, transcript at 492 [Zimmerman]; 1190 [Loving].)
Artificial caps on compensation yield unconscionable results. An attorney who is limited to compensation of $1,200 would reach the cap after working 30 in-court hours on a felony case. An attorney who is limited to compensation of $800 would reach the cap after working only 20 in-court hours on a misdemeanor case. The testimony established that many cases require an attorney to work over 100 hours on a case. (See, transcript at 1821-1822 [Reimer].) While an attorney may be able to receive compensation in excess of the statutory cap by demonstrating “extraordinary circumstances” (but cf., People v Thompson, supra), NYCLA has established that children and indigent adults in Family and Criminal Court proceedings in New York City have suffered, and will continue to suffer, irreparable harm absent permanent injunctive and declaratory relief.
Chief Judge Judith S. Kaye proposed, over three years ago, rates of $75 in felony and Family Court matters, and $60 per hour for misdemeanor cases. (See, exhibit 153 [State of the Judiciary 2000].) No evidentiary basis was presented at trial to establish that these proposed rates would eliminate or relieve the current crisis. The Governor has recently proposed similar increases. (See, n 3, supra.)
Although injunctive relief will financially impact defendants, these fiscal concerns are heavily outweighed by the irreparable harm that the most vulnerable in our society will continue to suffer if permanent injunctive relief is denied. (See, Klostermann v Cuomo, 61 NY2d 525, 537 [1984].)
The State and City’s argument that injunctive relief should not issue until the Legislature has been given an opportunity to act must be rejected. The Legislature has failed to act in response to last year’s judicial determination that the rates are unconstitutional as applied to the representation of certain litigants in Family Court proceedings in New York City. “The 18-B compensation rates, as currently applied, systematically deprive indigents of effective counsel.” (Nicholson v Williams, supra, 203 F Supp 2d at 256; see also, In re Nicholson, 181 F Supp 2d 182 [ED NY 2002] [granting preliminary injunction].) Furthermore, the Legislature has failed to take action in re *790 sponse to the decisions rendered by this court and the Appellate Division. Faced with 17 years of legislative inaction and proof of real and immediate danger of irreparable constitutional harm, this court can no longer wait for the legislative branch to protect the fundamental interests of children and indigent litigants. Therefore, this court issues a mandatory permanent injunction raising the rates to $90 an hour, without distinction between in- and out-of-court work, and without ceilings on total per case compensation, until the Legislature addresses the issue.
NYCLA’s request for relief in the form of a declaratory judgment and permanent injunction is granted as follows: It is declared that defendant State of New York has a constitutional and statutory obligation to ensure that qualified assigned private counsel are available and able to provide meaningful and effective representation to children and indigent adults in New York City; it is declared that defendant State of New York’s failure to increase the rates paid to assigned private counsel, to abolish the arbitrary distinction between the rates paid for in-court and out-of-court work, and to remove the caps on total per case compensation has created a severe and unacceptably high risk that children and indigent adults are receiving inadequate legal representation in New York City in violation of the New York and United States Constitutions; it is declared that those portions of section 722-b of the County Law, section 245 of the Family Court Act, and section 35 of the Judiciary Law fixing these rates and limits are unconstitutional as applied to the representation of children and indigent adults in New York City; and accordingly, it is ordered that NYCLA’s motion for a permanent injunction is granted to the extent that defendant City of New York is directed to pay assigned counsel the interim rate of $90 an hour for in-court and out-of-court work, in Criminal Court, Family Court (other than those Family Court matters for which the State of New York has been paying the vouchers) and Supreme Court, Criminal Term until modification of County Law § 722-b by the Legislature or further order of this court; and it is further ordered that defendant State of New York is directed to pay assigned counsel the interim rate of $90 an hour for in-court and out-of-court work, as it relates to such representation in Family Court in New York City, until the Legislature modifies Judiciary Law §35.

. This statement is inscribed on the portico above the entrance to the New York County Supreme Court. Although attributed to George Washington (see, People v Sardone, 48 Misc 2d 125, 132 [Crim Ct 1965]; In re Florida Bar, 284 So 2d 686, 690 [Fla 1973]; State ex rel. Florida Bar v Calhoon, 102 So 2d 604, 608 [Fla 1958]) from his September 28, 1789 letter to Edmund Randolph urging him to accept the nomination to the office of United States Attorney General, it is apparently paraphrased from the sentence which reads, “Impressed with a conviction that the due administration of justice is the firmest pillar of good Government, I have considered the first arrangement of the Judicial department as essential to the happiness of our Country, and to the stability of its political system; hence the selection of the fittest characters to expound the laws, and dispense justice, has been an invariable object of my anxious concern.” (John C. Fitzpatrick, editor, The Writings of George Washington from the Original Manuscript Sources [1745-1799] [emphasis added].)

. The State’s ex parte written communication, after the close of the evidence and after posttrial submissions, of the City of New York’s recent contract with the Legal Aid Society wherein, apparently, an increased substantial number of attorneys will represent indigent defendants and supposedly reduce the need for assigned counsel in criminal actions, does not relieve the State from its ultimate obligation to provide meaningful and effective assistance of counsel to children and indigent adults in the criminal and family courts, nor does it cure the inadequacy of the statutory rates. Indeed, although it may relieve the crisis, the claims remain justiciable. However, this court will not consider the effects of such contract as it is outside the evidentiary record. This court is also aware of Governor George E. Pataki’s recent proposal “raising assigned counsel rates to $75 an hour for felonies and Family Court matters and $60 an hour for other cases largely by imposing new fees on attorneys and their clients.” (John Caher, Pataki Proposes Higher Fees To Fund Raises in 18-B Rates, NYLJ, Jan. 30, 2003, at 1, col 3.) This does not change the outcome of this case. The vagaries of the legislative process will determine the ultimate rate. Moreover, the proposal, even if approved by the Legislature, would not raise the rates until January 1, 2004. (Id.) The affected litigants are entitled to the present relief.

. Unlike Judiciary Law § 35-b (5) (a), where the Legislature delegated the obligation to promulgate and periodically update a schedule of fees to be paid attorneys assigned to indigent capital defendants to the respective Appellate Division screening panels in consultation with the Administrative Board of the Courts subject to the approval of the Court of Appeals, *764 articlel8-B of the County Law contains no provision for periodic review, leading to erosion in value due to inflation and a continual need for legislative amendment. (See, Matter of New York State Assn. of Criminal Defense Lawyers v Kaye, 269 AD2d 14 [3d Dept 2000], affd 96 NY2d 512 [2001].)

. As used herein, the terms “assigned counsel,” “panel attorneys,” or “18-B attomeys/counsel” refer to private attorneys assigned to represent children or indigent adults pursuant to article 18-B of the County Law, section 245 of the Family Court Act, or section 35 of the Judiciary Law.

. Panel attorneys submit vouchers for payment of their fees on each case. However, more than one voucher may be submitted on a particular case, so that the number of vouchers processed does not necessarily equal the number of cases handled by assigned counsel.

. When a petition of neglect or abuse is filed and the child is removed, there must generally be an arraignment within 24 hours. Upon arraignment, the JRD attorney covering intake is assigned to represent the child, who may have already been removed from the home where he was living. At the first appearance, the Administration for Children Services files a petition with the court and usually a caseworker who conducted an investigation is able to tell the judge about the case. (See, transcript at 644 [Drinane].) There may or may not be a parent who was present at the time the petition is filed. If a parent is present, the court looks to assigned counsel staffing intake to represent the parent or other children. (See, transcript at 646 [Drinane].) When a parent wants immediate return of the child, the lawyer will seek a hearing pursuant to Family Court Act § 1028. At a 1028 hearing the court must determine whether or not the child is at imminent risk, and if the court so finds, the child will be placed with or remain in foster care, assuming the child is removed. Whether the child is removed or not, the case proceeds to fact-finding and disposition.

. In response to the lack of attorneys, the panel administrators, in conjunction with the City of New York, took the extraordinary measure and agreed to pay assigned counsel $50 an hour to staff night arraignment shifts in the Bronx and Manhattan, without legislative approval. The $50 rate was set before the City became involved in processing the payment vouchers. The City also paid $60 an hour to staff the overnight shift in Manhattan. Although the City funded the payments, the Office of Court Administration processed the vouchers for a period of time until the City took over that function, at which time the higher rates were paid in both the First and the Second Departments. (See, transcript at 1939-1940 [Becker].) Despite the statutory rates, the City has continued to pay higher rates in these instances without legislative authority.

. Pursuant to CPL 180.80, a defendant arrested on a felony complaint who is held in custody for five days (or six days, if a Saturday, Sunday or legal holiday occurs during the custody) must be released from custody on his own recognizance, with certain exceptions, unless there is a disposition of the felony complaint or the court commences a hearing.

. Generally, in order to declare a statute or a provision thereof unconstitutional, the invalidity of the law must be demonstrated beyond a reasonable doubt. (Hope v Perales, 83 NY2d 563, 574-575 [1994].)

. “Persons involved in certain family court proceedings may face the infringements of fundamental interests and rights, including the loss of a child’s society and the possibility of criminal charges, and therefore have a constitutional right to counsel in such proceedings. Counsel is often indispensable to a practical realization of due process of law * * *.” (Id.)

. In New York, the Legal Aid Society, a nonprofit organization, was supposed to function like a public defender’s office, representing nearly all indigent defendants. In 1994, it was weakened in a dispute with then Mayor Rudolph W. Giuliani and now represents only about half of the roughly 385.000 people arrested on misdemeanor and felony charges each year. Smaller organizations were created to handle some cases. But about 115,000 indigent defendants are assigned to private lawyers each year, as are roughly 170.000 more who have gotten summonses for low-level violations as part of New York City’s quality-of-life campaign.

. See, New York County Lawyers’ Assn. v State of New York, supra, 192 Misc 2d at 430-431 (2002) (“[T]he claim of ineifectiveness is ultimately concerned with the fairness of the process as a whole rather than its particular impact on the outcome of the case * * * and therefore this court finds the more taxing two-prong Strickland standard used to vacate criminal convictions inappropriate in a civil action that seeks prospective relief * * * Accordingly, because the right to effective assistance of counsel in New York *781 ís much more than just the right to an outcome, threatened injury is enough to satisfy the prejudice element and obtain prospective injunctive relief to prevent further harm”); Matter of Swinton v Safir, 93 NY2d 758, 765-766 (1990) (“proof of a likelihood of the occurrence of a threatened deprivation of constitutional rights is sufficient to justify prospective or preventive remedies * * * without awaiting actual injur/’); see also, Benjamin v Fraser, 264 F3d 175 (2d Cir 2001) (pretrial detainees were not required to show actual injury in challenging prison regulations which allegedly adversely affected their Sixth Amendment right to counsel by impeding attorney visitation).

. Id. at 335 (finding in section 262 a “right, expressly conferred by the Legislature to have * * * counsel present from the time of [the client’s] appearance”) (citation omitted); see also, e.g., Matter of DeMarco v Raftery, 242 AD2d 625 (2d Dept 1997) (in child support proceeding involving willful violation of an order, appointment of counsel at a late stage in the proceedings violated respondent’s right to counsel).

. The right to testify before a grand jury is a statutory right, and is not of constitutional dimension. (Lopez v Riley, 865 F2d 30, 32 [2d Cir 1989]; Saldana v New York, 850 F2d 117, 119 [2d Cir 1988].) There exists no federally cognizable ineffective assistance claim concerning advice regarding the grand jury process. (Dickens v Filion, 2002 WL 31477701, 2002 US Dist LEXIS 21429 [SD NY 2002].)

. Where police have probable cause to believe that a crime of domestic abuse had occurred, the Legislature in 1994 made arrest mandatory. (GPL 140.10 [4].) The law requires police to determine who was the primary aggressor in cases where there were cross complaints. (Id.) In 1996, the Legislature amended the Domestic Relations Law to provide that, where domestic violence is proven, it must be considered by courts in making custody and visitation orders. (Domestic Relations Law § 240 [1] [a].)

. “Assigned counsel rates have not been increased in 17 years and are generally acknowledged to be too low to assure an adequate supply of attorneys willing to participate.” (2003 Mem in Support of Governor’s Budget Bill at 14.) “The rates for assigned counsel have not been increased since 1986, making it increasingly difficult to ensure representation for the indigent.” (2003 Executive Budget at 81.)