[871 NYS2d 404]

In the Matter of EDWARD A. MARON et al., Appellants-
Respondents, v SHELDON SILVER, as Speaker of the State
Assembly, et al., Respondents-Appellants, et al., Respon-
dent.

Third Department, November 13, 2008

## APPEARANCES OF COUNSEL

*Law Office of Steven Cohn, P.C.*, Carle Place (*Steven Cohn* of counsel), for appellants-respondents.

*Andrew M. Cuomo, Attorney General*, Albany (*Julie M. Sheridan* of counsel), for Sheldon Silver and others, respondents-appellants.

*Schlam, Stone & Doland, L.L.P.*, New York City (*Richard H. Dolan* of counsel), for Eliot Spitzer and another, respondents-appellants.

*Stroock & Stroock & Lavan, L.L.P.*, New York City (*Joseph L. Forstadt* of counsel), for The Association of Justices of the Supreme Court of the State of New York and others, amici curiae.

## OPINION OF THE COURT

Mercure, J.P.

Petitioners are current and former justices of various courts of the Unified Court System. Their salaries, which are paid by the state and specified by statute (*see* Judiciary Law §§ 220, 221-a *et seq.*), have not been increased since January 1, 1999. As set forth in a May 2007 report from the National Center for State Courts commissioned by the state's Chief Judge, no other state court judges have gone so long without a salary adjustment. It is undisputed that the decline in the real value of judicial pay due to inflation has been significant—the actual value of judicial salaries has declined approximately one third since 1999. Moreover, this long delay is far from unprecedented; in fact, New York judicial compensation has been increased only twice in the past 20 years. Thus, our state's judicial salaries currently rank 49th in the nation when adjusted for statewide cost of living, despite New York's preeminence as an economic and commercial center.

This stagnation of judicial salaries has been a growing concern. In an attempt to address the situation, the Judiciary requested a $69.5 million appropriation for 2006-2007 to fund salary adjustments "pursuant to a chapter of the laws of 2006" (*see* NY Const, art VI, § 25 [a] [requiring that judicial compensation "be established by law"]). While this appropriation was included in the state budget (L 2006, ch 51, § 2), the Legislature failed to enact a chapter law or take any other action to alter the salaries set forth in the Judiciary Law. Thus, the appropriated funds were not disbursed and salaries continue at 1999 levels.

Petitioners commenced this CPLR article 78 proceeding seeking a writ of mandamus compelling (1) respondent Comptroller to disburse the appropriated funds, and (2) the Legislature and Governor to maintain judicial salaries apace with inflation. Petitioners further seek declarations that the current system of establishing judicial salaries violates separation of powers

principles and the Compensation Clause of the NY Constitution,[1] as well as denying judges equal protection under the law. Petitioners assert that an inflation adjustment for all years since 1999 is mandated.

Respondents moved to dismiss for, among other things, failure to state a cause of action. Supreme Court amended the petition to include the State of New York as a respondent,[2] and dismissed all claims as against the Comptroller, the Speaker of the Assembly, President Pro Tem of the Senate and the Governor, as well as all claims in their entirety except so much of the petition as alleged that the failure to increase judicial compensation impinged on the independence of the judicial branch in violation of the Compensation Clause and separation of powers principles. Petitioners and respondents now cross-appeal.

■ Initially, we echo the sentiments of the courts that have been required to consider constitutional challenges in the face of similar deplorable legislative inaction on the funding of the judicial branch: "We regret that it falls [to] our lot to decide [this] case[ ] . . . Nevertheless[,] . . . [petitioners] are entitled to have their case[ ] heard and decided by a court of [New York], and under the law there is no other court to which they could go" (*Atkins v United States*, 556 F2d 1028, 1040 [Ct Cl 1977], *cert denied* 434 US 1009 [1978]; *see Evans v Gore*, 253 US 245, 247-248 [1920]; *Kremer v Barbieri*, 48 Pa Commw 557, 560, 411 A2d 558, 560 [1980], *affd* 490 Pa 444, 417 A2d 121 [1980]). Although the Justices of this Court have an interest in the outcome of this case, we are required to hear and dispose of these cross appeals pursuant to the rule of necessity, which provides that "wherever it becomes necessary for a judge to sit even where he [or she] has an interest—where no provision is made for calling another in, or where no one else can take his [or her] place—it is [the judge's] duty to hear and decide"

---

**1.** As relevant here, that Clause provides: "The compensation of a judge . . . *shall be established by law and shall not be diminished during the term of office for which he or she was elected or appointed*" (NY Const, art VI, § 25 [a] [emphasis added]).

**2.** Respondents indicate that they do not challenge this amendment of the petition on appeal. In addition, we note that Supreme Court did not resolve petitioners' separate claim against respondent Office of Court Administration (hereinafter OCA) concerning health benefits. Petitioners indicate that cause of action has been severed. Hence, that claim is not before us, OCA has not filed a separate brief on this appeal and all references to respondents in this decision should be read to exclude OCA.

(*United States v Will*, 449 US 200, 214 [1980] [internal quotation marks and citation omitted]; *see Maresca v Cuomo*, 64 NY2d 242, 247 n 1 [1984], *appeal dismissed* 474 US 802 [1985]).

We further address as a threshold matter respondents' contention that our review of this case is foreclosed by separation of powers concerns. Specifically, respondents assert that judicial inquiry is precluded because the Compensation Clause grants the Legislature and the Governor the power to establish judicial compensation, they have done so by providing a salary schedule in the Judiciary Law, and that salary schedule has not been directly diminished. The NY Constitution expressly grants budgetary and appropriation powers to the other governmental branches, providing that "[n]o money shall ever be paid out of the state treasury or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law" (NY Const, art VII, § 7). Inasmuch as separation of powers principles generally preclude courts from "intrud[ing] upon the policy-making and discretionary decisions that are reserved to the legislative and executive branches" (*Campaign for Fiscal Equity, Inc. v State of New York*, 8 NY3d 14, 28 [2006] [internal quotation marks and citation omitted]), it is well settled that "[j]udicial intervention in the state budget may be invoked only in the narrowest of instances" (*id.* at 29 [internal quotation marks and citation omitted]; *see Klostermann v Cuomo*, 61 NY2d 525, 541 [1984]).

Yet, separation of powers principles also dictate that the courts are the ultimate arbiters of constitutional text (*see United States v Morrison*, 529 US 598, 616 n 7 [2000]; *Campaign for Fiscal Equity, Inc. v State of New York*, 8 NY3d at 28; *Cohen v State of New York*, 94 NY2d 1, 11 [1999]). Thus, "the budgetary process is not always beyond the realm of judicial consideration[;] . . . the courts will always be available to resolve disputes concerning the *scope of that authority which is granted by the Constitution to the other two branches of the government*" (*Silver v Pataki*, 96 NY2d 532, 542 [2001] [internal quotation marks and citations omitted]; *accord Pataki v New York State Assembly*, 4 NY3d 75, 96 [2004]; *Saxton v Carey*, 44 NY2d 545, 551 [1978]; *see New York County Lawyers' Assn. v State of New York*, 294 AD2d 69, 72 [2002]). In our view, then, the parties' dispute over whether the legislative and executive branches have complied with the constitutional limitations placed on their authority presents a justiciable controversy (*see Atkins v United States*, 556 F2d at 1052-1054).

Moreover, the fundamental precept of the separation of powers doctrine is that "[o]ur State government, like the Federal [g]overnment, is a tripartite institution, with power variously distributed" among *"three* coequal branches"—including the judicial branch *(Saxton v Carey,* 44 NY2d at 549 [emphasis added]; *see Under 21, Catholic Home Bur. for Dependent Children v City of New York,* 65 NY2d 344, 355-356 [1985]; *Matter of County of Oneida v Berle,* 49 NY2d 515, 522 [1980]). Despite the textual grant of budgetary and appropriation powers to the legislative and executive branches, the judicial branch *must* retain the inherent power to protect itself from the impairment of its ability to function if it is to continue in existence as an independent, coequal branch of government *(see People ex rel. Burby v Howland,* 155 NY 270, 282-283 [1898]; *N.Y. County Lawyers' Assn. v State of New York,* 192 Misc 2d 424, 436-437 [2002], *appeal dismissed* 305 AD2d 1123 [2003]; *Matter of McCoy v Mayor of City of N.Y.,* 73 Misc 2d 508, 510-511 [1973], *mod on other grounds* 41 AD2d 929 [1973]; *see also Stilp v Commonwealth,* 588 Pa 539, 581-582, 905 A2d 918, 943-944 [2006]; *Jorgensen v Blagojevich,* 211 Ill 2d 286, 312-314, 811 NE2d 652, 667-668 [2004]; *Pena v District Ct. of Second Jud. Dist. in & for City & County of Denver,* 681 P2d 953, 955-957 [Colo 1984]). Therefore, even in the absence of Compensation Clause protection, this Court has held that a legislative body "violate[s] public policy and the constitutional princip[les] of separation of powers in setting [an] exceedingly meager [$500 annual] salary" for a town justice *(Matter of Kelch v Town Bd. of Town of Davenport,* 36 AD3d 1110, 1112 [2007]). We reasoned that judicial intervention was necessary because the legislative body had impinged upon the independence of the Judiciary, and that "[l]egislation cannot be sustained where the independence of the judiciary and the freedom of the law will depend upon the generosity of the legislature" *(id.* at 1111 [internal quotation marks and citations omitted]; *accord People ex rel. Burby v Howland,* 155 NY at 283). Inasmuch as one of the questions before us is whether petitioners have stated a cause of action based upon the other branches' alleged use of the Compensation Clause to undermine the independence of the judicial branch, our review is not precluded here.

Turning to petitioners' claims herein, the issue before us is not whether New York's judges deserve a pay raise—it is undisputed that they do. Rather, the issue presented is whether petitioners have stated a viable claim in that regard. Because

this appeal involves a motion to dismiss, we must afford the pleadings "a liberal construction[,] . . . accept the facts as alleged in the [petition] as true, accord [petitioners] the benefit of every possible favorable inference, and determine only whether the facts as alleged" in the petition and supporting affidavits "fit within any cognizable legal theory" (*Leon v Martinez*, 84 NY2d 83, 87-88 [1994] [citations omitted]; *see Guggenheimer v Ginzburg*, 43 NY2d 268, 275 [1977]). With that in mind, we first address petitioners' assertion that the Compensation Clause entitles them to a salary increase to offset the effects of inflation since 1999. Next, we address their claim that respondents have violated the separation of powers by interfering with the independence of the Judiciary. Finally, we consider petitioners' arguments that they adequately set forth claims based upon a violation of the Equal Protection Clause, and for mandamus to compel disbursement of the 2006 "dry appropriation" approved by the Legislature.

## I. The Compensation Clause

Petitioners argue that the inaction of the Legislature in the face of the erosion of their salaries' real value by inflation violates that portion of the Compensation Clause providing that "[t]he compensation of a judge . . . shall not be diminished during [his or her] term of office" (NY Const, art VI, § 25 [a]). Essentially, they maintain that the Compensation Clause guarantees a real income level and requires that salaries be increased to sustain that income level in the face of inflation. While we wholeheartedly sympathize with petitioners in this matter, our review of the constitutional history and text of the Compensation Clause, as well as relevant case law, persuades us that this claim cannot succeed.

The language of the New York Compensation Clause tracks article III (§ 1) of the US Constitution, which states that federal "Judges . . . shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." As the parties agree, the purpose of both the federal and state Compensation Clauses is to protect the independence of the Judiciary, consistent with the doctrine of separation of powers. The Supreme Court of the United States has explained that the federal clause reflects the view that " '[n]ext to permanency in office, nothing can contribute more to the independence of the judges than a fixed provision for their support' "—a view informed by a long history of abuses by

the English crown both in England and the American Colonies (*United States v Hatter*, 532 US 557, 568 [2001], quoting Hamilton, Federalist No. 79; *see United States v Will*, 449 US at 218-219; *O'Malley v Woodrough*, 307 US 277, 282 [1939]). Indeed, this view is further reflected in a grievance listed in the Declaration of Independence: the King "ha[d] made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries" (Declaration of Independence para 11 [US 1776]).

Protection of the Judiciary's independence was deemed necessary because, as expressed by Alexander Hamilton, "the judiciary is beyond comparison the weakest of the three departments of power," having "no influence over either the sword or the purse" (Hamilton, Federalist No. 78). Further, it is the nature of the judicial enterprise that "[i]n fulfilling their duties, judges must frequently challenge the actions of the very governmental bodies who provide the financial and other resources they need to operate. Such challenges are unavoidable. They are an inherent part of the adjudicatory process" and, thus, "[r]etribution against the courts for unpopular decisions is an ongoing threat" (*Jorgensen v Blagojevich*, 211 Ill 2d at 300, 811 NE2d at 660-661; *see United States v Hatter*, 532 US at 568-569).

The Compensation Clause was the Framers' answer to both this ongoing threat of retribution and the ravages of inflation (*see United States v Hatter*, 532 US at 569; *United States v Will*, 449 US at 218-220; *Atkins v United States*, 556 F2d at 1048). The clause promotes independence by prohibiting diminution of judicial compensation (*see United States v Hatter*, 532 US at 567-569; *Evans v Gore*, 253 US at 253-254). At the same time, it gives Congress the discretion to allow salary increases, "thereby accepting a limited risk of external influence in order to accommodate the need to raise judges' salaries when times change[ ]" (*United States v Will*, 449 US at 220; *see Atkins v United States*, 556 F2d at 1045-1048; *see also Williams v United States*, 535 US 911, 914 [2002, Breyer, J., dissenting from denial of certiorari]). It was recognized that this risk of external influence was unavoidable precisely because

> " 'the fluctuations in the value of money, and in the state of society, rendered a fixed rate of compensation [of judges] in the Constitution inadmissible . . . It was therefore necessary to *leave it to the discretion of the legislature* to vary its provisions in

conformity to the variations in circumstances' "
(*United States v Will*, 449 US at 220, quoting Ham-
ilton, Federalist No. 79 [emphasis added]).[3]

In addition to promoting independence and permitting Congress
to increase judicial salaries as circumstances warrant, the
Compensation Clause serves the related purpose of assuring
prospective judges that compensation will not diminish, "serv-
[ing] to attract able lawyers to the bench and thereby enhance[ ]
the quality of justice" (*id.* at 221).

Federal case law makes clear, however, that the Compensation
Clause neither offers complete protection of the purchasing
power of judicial salaries nor mandates cost of living adjust-
ments to offset inflation. Most recently, the Supreme Court of
the United States, overruling *Evans v Gore* (*supra*), rejected the
notion that the diminution of judicial salaries' purchasing power
through nondiscriminatory income taxation constitutes a viola-
tion of the Compensation Clause (*see United States v Hatter*,
532 US at 569-572; *see also Evans v Gore*, 253 US at 265-266
[Holmes, J., dissenting]). The Court explained that while "the
Compensation Clause offers protections that extend beyond a
legislative effort directly to diminish a judge's pay, say, by order-
ing a lower salary . . . [,] a nondiscriminatory tax that treat[s]
judges the same way it treat[s] other citizens" is merely an
ordinary burden of citizenship (*United States v Hatter*, 532 US
at 569).[4]

Particularly relevant here, the Supreme Court of the United
States has also held that Congress may, before the effective date
of a scheduled cost of living adjustment, enact a statute rescind-
ing that adjustment for judges, high level executive employees
and members of Congress despite the fact that most other
federal employees are to receive the increase. The Court
explained that "the Compensation Clause does not erect an
absolute ban on all legislation that conceivably could have an
adverse effect on compensation of judges" (*United States v Will*,

---

**3.** Although the Framers initially considered an indexing method, tying
the value of judicial salaries to some commodity, the proposal was criticized on
the ground that changes in the state of the economy could leave commodity
prices unstable (*United States v Will*, 449 US at 220).

**4.** In contrast, the Court struck down a law that "single[d] out judges for
adverse treatment"—specifically, by imposing Social Security taxes, "a new
financial obligation upon sitting judges," without imposing that burden on
any other federal employees—"solely because of" life tenure, "a feature
required by the Constitution to preserve judicial independence" (*United States
v Hatter*, 532 US at 572-574).

449 US at 227). Inasmuch as the statutes at issue took effect before the scheduled cost of living increase "had become a part of the compensation due Article III judges . . . [,] the departure from [the schedule] *in no sense diminished the compensation Article III judges were receiving*" (*id.* at 228 [emphasis added]).

Implicit in the Court's reasoning in *United States v Will* (*supra*) is the conclusion that the Compensation Clause does not require that judicial salaries must be kept apace with inflation (*see Williams v United States*, 535 US at 921 [Breyer, J., dissenting from denial of certiorari]; *United States v Hatter*, 532 US at 583-584 [Scalia, J., concurring in part and dissenting in part]). In that regard, the Court noted that "it would be particularly ironic if we were to bind Congress to an indexing scheme for salaries when the Framers themselves rejected an indexing proposal" (*United States v Will*, 449 US at 228 n 33). The United States Court of Appeals for the Federal Circuit more recently reached the same result in considering similar legislation, even in the face of severe restrictions placed on judges' ability to earn outside income (*see Williams v United States*, 240 F3d 1019, 1032-1033 [2001], *cert denied* 535 US 911 [2002]). The court concluded that "[w]hile . . . the repeated departures from the" cost of living adjustment schedule "were perhaps regrettable and ill-considered policy choices, we cannot accept that the Constitution—which as interpreted in *Will* lodges exactly this type of policy decision with the Congress—forbids it" (*id.* at 1033).

*Will* and *Williams* are consistent with a prior case, *Atkins v United States* (*supra*), in which the Court of Claims granted a motion to dismiss an action by federal judges seeking to recover pursuant to the Compensation Clause based upon the failure of Congress to enact salary increases under very similar circumstances to those present here (*see* 556 F2d at 1033-1034). The Court of Claims indicated that while the after-tax purchasing power of federal judicial salaries had declined 36% from 1969 to 1977, judges had received only a 5% salary increase; Congress had acted on behalf of most other federal employees, increasing general schedule federal civil service pay by an average of 65.7%; judges' workloads had risen steeply; and the plaintiffs had submitted affidavits demonstrating an unprecedented number of resignations due to financial reasons, increasing difficulty inducing attorneys in private practice to accept federal judgeships, and a belief among judges that Congress was "using judicial salaries as a political football" (*id.* at 1042). The court

nevertheless rejected the plaintiff judges' "pure inflation" theory, stating that the Constitution leaves "to the sound discretion of the political branches the adjustment of the judges' salaries as economic and other circumstances . . . require[ ]" (*id.* at 1048-1049). As a result, the court concluded, it "ha[d] no power to grant relief on plaintiffs' complaint that inflation without substantial pay increases has diminished the real value of their official salaries" (*id.* at 1051; *see Kremer v Barbieri*, 48 Pa Commw 557, 568, 411 A2d 558, 563 [1980], *supra* [holding that the diminishing value of compensation due to substantial inflation without significant pay raises could not be deemed a Compensation Clause violation despite "discrimination" against judges by legislature that granted raises to other state employees]; *cf. Overton County v State ex rel. Hale*, 588 SW2d 282, 287-290 [Tenn 1979] [determining that prohibition on increases in state Compensation Clause was not violated by a law providing for increases consistent with consumer price index]).[5]

As respondents argue, the constitutional history of the New York Compensation Clause similarly demonstrates that the power to increase state judicial compensation is left to the Legislature's discretion. Although the NY Constitution has prohibited diminishment of judicial compensation since 1846, it has alternated between prohibiting and permitting increases (*compare* 1846 NY Const, art VI, § 7 [prohibiting increases, along with decreases], *and* 1894 NY Const, art VI, § 12 [same], *with* 1846 NY Const, art VI, § 14, as amended Dec. 6, 1869 [prohibiting decreases and implicitly allowing increases]; *see also Matter of Gresser v O'Brien*, 146 Misc 909, 916-917 [Sup Ct, NY County 1933], *affd* 263 NY 622 [1934] [tracing the history of the treatment of judicial compensation in the NY Constitution]). In 1909, the NY Constitution was amended to include a specific salary schedule for judges (*see* 1894 NY Const, art VI, § 12, as amended Nov. 2, 1909; *see also* Carter, New York State Constitution: Sources of Legislative Intent, art VI, § 25, at 85 n 2 [1988]), which remained in place for over 15 years despite the fact that greatly increased costs of living in the state had

---

5. As explained below, in our discussion of plaintiffs' separation of powers claims, the court in *Atkins* determined that a claim under the Compensation Clause for failure to raise salaries in the face of substantial inflation could be shown if the plaintiffs demonstrated either a plan or gross neglect on the part of the other branches, operating to punish judges or to drive them from office (*see Atkins v United States*, 556 F2d at 1054). The court concluded that despite the facts detailed above, the plaintiffs therein did not make such a showing.

rendered that compensation inadequate and led to forced resignations (*see* Problems Relating to Judicial Administration and Organization, 1938 Rep of NY Constitutional Convention Comm, vol 9, at 341; Judiciary Constitutional Convention of 1921, Rep to Legislature, Jan. 4, 1922, 1922 NY Legis Doc No. 37, at 29).

In 1921, over objections that "it was wiser to fix compensation of judges in the Constitution rather than to give the Legislature the power to favor or punish judges through the power to fix their compensation" (Problems Relating to Judicial Administration and Organization, 1938 Rep of NY Constitutional Convention Comm, vol 9, at 339; *see* Executive Comm Debate, Judiciary Constitutional Convention of 1921, Dec. 5, 1921, at 497), the Judiciary Constitutional Convention recommended that the discretion to increase judicial salaries be given to the Legislature once again. Noting the severe effects of inflation on the 1909 salary schedule set forth in the NY Constitution, the convention explained that the rationale for restoring the Legislature's discretion to increase salaries was ultimately that "[t]he compensation of judges should, in the judgment of the present convention, be left entirely to the [L]egislature, which after all is the body always directly in touch with and responsible to the people" (Judiciary Constitutional Convention of 1921, Rep to Legislature, Jan. 4, 1922, 1922 NY Legis Doc No. 37, at 29). Hence, pursuant to these recommendations, the Compensation Clause was amended again in 1925 to take on its current form (*see Matter of Gresser v O'Brien*, 146 Misc at 918-919; Carter, New York State Constitution: Sources of Legislative Intent, art VI, § 25, at 85 n 2 [1988]).[6]

It is therefore readily apparent that the drafters of the current New York Compensation Clause were cognizant of the effect of inflation on judicial compensation over time, as well as the dangers to judicial independence that come into play when the Legislature is given the power to increase judicial compensation. Like the Framers of the US Constitution, the people of the State of New York nonetheless ultimately chose to leave it to the Legislature's discretion to allow salary increases, "thereby accepting a limited risk of external influence in order to accommodate the need to raise judges' salaries when times changed"

---

**6.** Even after the Compensation Clause was amended in 1925 to restore the Legislature's discretion, compensation often remained unchanged for long periods of time—21 years, from 1926 to 1947, and 18 years, from 1957 to 1975.

(*United States v Will*, 449 US at 220; *see County of Broome v Bates*, 197 Misc 88, 91 [Sup Ct, Albany County 1950], *affd* 302 NY 587 [1951] ["(T)he matter of compensation for Justices of the Supreme Court is left for the Legislature"]).[7] Thus, while we agree with petitioners that the failure to increase judicial salaries in the face of substantial inflation represents a policy choice that is ill-considered at best, it is the NY Constitution itself that places the discretion to make such a choice with the Legislature. Hence, the diminishing force of inflation, even when other state employees have received salary increases, cannot be deemed a sufficient basis for a claim under New York's Compensation Clause (*see United States v Will*, 449 US at 228; *Williams v United States*, 240 F3d at 1032-1033; *Kremer v Barbieri*, 48 Pa Commw at 568, 411 A2d at 563; *see also Larabee v Spitzer*, 19 Misc 3d 226, 235-237 [2008]).

That said, however, any exercise of discretion by the Legislature on this matter must be constrained by separation of powers principles. As explained above, while that doctrine dictates that the courts may not intrude upon discretionary determinations that are reserved to the other branches of government (*see e.g. Campaign for Fiscal Equity, Inc. v State of New York*, 8 NY3d 14, 28-29 [2006], *supra*), it also mandates that the legislative and executive branches refrain from hindering the independence and proper functioning of the judicial branch (*see e.g. Matter of Kelch v Town Bd. of Town of Davenport*, 36 AD3d 1110, 1112 [2007], *supra*; *Stilp v Commonwealth*, 588 Pa 539, 581-582, 905 A2d 918, 943-944 [2006], *supra*; *Jorgensen v Blagojevich*, 211 Ill 2d 286, 312-314, 811 NE2d 652, 667-668 [2004], *supra*; *Glancey v Casey*, 447 Pa 77, 83-84, 288 A2d 812, 815 [1972]). The Compensation Clause exists to protect judicial independence, not undermine it and, thus, any use of the Compensation Clause by the Legislature as "a financial 'instru-

---

7. We reject petitioners' argument that New York's Compensation Clause should be interpreted more broadly than the federal Compensation Clause because *Evans v Gore* (253 US 245 [1920], *supra*), which held that the federal clause prohibits income taxation, had not yet been overruled at the time of the ratification of the New York clause. Although *Evans* was still good law, the meaning that the case "imputed to the history which explains" the federal Compensation Clause "was contrary to the way in which it was read by other English-speaking courts" and, thus, the case was criticized in contemporary legal scholarship and rejected by most courts considering the matter (*O'Malley v Woodrough*, 307 US 277, 281 [1939], *supra*)—including this Court in a plurality decision, *Black v Graves* (257 App Div 176 [1939], *affd* 281 NY 792 [1939]), which eschewed the overly broad interpretation of the Compensation Clause employed in *Evans* well before the case was overruled.

ment [with which] to attack [one's] independence as a judge' "
cannot be tolerated (*Atkins v United States*, 556 F2d at 1049,
quoting *Evans v Gore*, 253 US at 265 [Holmes, J., dissenting]).
In that vein, we next consider whether petitioners have alleged
sufficient facts in their pleadings and supporting affidavits to
state a valid claim of a discriminatory attack on the judicial
branch that has impaired or imminently threatened the
Judiciary's independence and ability to function.

## II. Petitioners' Separation of Powers Claim

The New York courts are not strangers to claims that the
Legislature, in refusing to increase compensation rates, has cre-
ated constitutional crises and impaired the Judiciary's ability to
function. Indeed, the courts were recently forced to intervene in
the face of "17 years of legislative inaction" on statutory
compensation rates paid to assigned counsel (*New York County
Lawyers' Assn. v State of New York*, 196 Misc 2d 761, 790 [2003],
*appeal withdrawn* 2 AD3d 1489 [2003]). Although the claim of
harm in the assigned counsel case was prospective only and the
Legislature had reserved to itself the task of establishing
compensation rates, the Appellate Division, First Department,
nonetheless concluded that claims asserted therein were justici-
able (*New York County Lawyers' Assn. v State of New York*, 294
AD2d 69, 72-74 [2002], *supra*). Evidence was presented that,
among other things, inflation had resulted in a situation in
which assigned counsel paid the statutory rates would "lose
$9.75 for every hour . . . work[ed] out of court and w[ould]
profit only $5.75 for every hour worked in court" (*N.Y. County
Lawyers' Assn. v State of New York*, 192 Misc 2d 424, 435 [2002],
*supra*), and that the low rate of compensation had both led to a
dearth of available assigned counsel and impaired the Judiciary's
ability to function (*New York County Lawyers' Assn. v State of
New York*, 196 Misc 2d at 764-778).

As the trial court noted, "when legislative appropriations
prove insufficient and legislative inaction obstructs the
judiciary's ability to function, the judiciary has the inherent
authority to bring the deficient state statute into compliance
with the Constitution" (*N.Y. County Lawyers' Assn. v State of
New York*, 192 Misc 2d at 436). Ultimately, the court concluded
that legislative inaction combined with the effect of inflation
had resulted in a *"real and immediate danger of irreparable
constitutional harm,"* and issued a permanent injunction
mandating an increase in compensation rates (*New York County*

*Lawyers' Assn. v State of New York*, 196 Misc 2d at 790 [emphasis added]).

Similarly, as discussed above, this Court recently had the occasion to resolve a separation of powers challenge to a legislative body's actions in setting a meager salary (*Matter of Kelch v Town Bd. of Town of Davenport*, 36 AD3d 1110 [2007], *supra*). As in the assigned counsel case, we also determined that judicial intervention was required despite our reticence in interfering with legislative actions or exercises of discretion. Critical to that decision was our finding that the respondent legislative body had "abuse[d] . . . its power on a constitutional level" (*id.* at 1112) by *"act[ing] in a manner likely to affect or impinge upon the independence of the judiciary"* (*id.* at 1113 [emphasis added]; *see People ex rel. Burby v Howland*, 155 NY 270, 283 [1898], *supra* [holding that it is the courts' high prerogative to intervene in order to protect judges from interference with judicial functions]; *Matter of Catanise v Town of Fayette*, 148 AD2d 210, 212-213 [1989] [intervention warranted where town impermissibly encroached upon judicial independence by lowering town justice's salary]; *but see Larabee v Spitzer*, 19 Misc 3d 226, 234 [2008], *supra* [finding that although there is no evidence that the Judiciary has not continued to function as in the past, such a showing is not necessary to establish a constitutional violation]).

These cases are in line with those of federal and other state courts that have suggested a willingness to grant relief for Compensation Clause violations arising out of legislative failure to raise judicial salaries, provided that there is "proof that the judicial system's proper functioning has thereby been impaired" (*Kremer v Barbieri*, 48 Pa Commw at 567, 411 A2d at 562). That is, in the absence of any showing of actual diminishment—as opposed to inflation eroding the value of a judicial salary—petitioners must "demonstrate the existence of a plan fashioned by the political branches, or at least of gross neglect on their part, ineluctably operating to punish the judges qua judges, or to drive them from office" (*Atkins v United States*, 556 F2d at 1054).[8] The court in *Atkins* further elaborated that gross neglect could be demonstrated by evidence of, for example,

---

**8.** There is no merit to petitioners' argument that the *Atkins* court's requirement of a showing of discriminatory attack on the independence of the Judiciary was called into question by the statement in *United States v Will* (449 US 200 [1980], *supra*) that "the Constitution makes no exceptions for 'nondiscriminatory' reductions" (*id.* at 226). *Will* makes clear that legislative

hyperinflation reducing salaries to "point zero," or "massive resignation for financial reasons" (*id.* at 1054-1055). The court emphasized, however, that evidence of a denial of pay raises to top level civil servants and members of Congress, along with judges, "substantially weakens [any] allegations of discrimination" (*id.* at 1055). In addition, *Atkins* and *Kremer* both make clear that mere allegations that individual judges have resigned for financial reasons are insufficient to show impairment of the Judiciary's functioning (*see id.* at 1055; *Kremer v Barbieri*, 48 Pa Commw at 567-568, 411 A2d at 562-563).

■ Here, Supreme Court properly recognized that, as in *Atkins*, the fact that legislators and senior executive branch officials have been denied a pay raise substantially weakens petitioners' claim that the failure to enact a salary increase is designed to influence the Judiciary (*see Atkins v United States*, 556 F2d at 1055). Nor do petitioners allege any formulation or steps taken in furtherance of a plan by the legislative and executive branches to attack the independence of the Judiciary or influence any future decisions (*see id.* at 1054; *cf. Matter of Kelch v Town Bd. of Town of Davenport*, 36 AD3d at 1112). Nevertheless, Supreme Court permitted petitioners' separation of powers claim to proceed based upon their allegations that: (1) "a number of judges and justices have resigned or chosen not to seek reelection because their compensation has not kept pace with inflation," and (2) the Legislature has refused to "maintain judicial salaries to keep pace with inflation" due to that institution's "displeasure over court decisions in cases involving the Governor's power vis-à-vis that of the Legislature in the budget process; capital punishment; school funding; and a case involving the election of a [s]tate [s]enator." In our view, these allegations fall short of stating a cause of action based upon a violation of separation of powers principles and, thus, Supreme Court erred in denying this part of respondents' motion to dismiss.

---

denial of a cost of living increase "in no sense diminishe[s] . . . compensation" within the meaning of the Compensation Clause (*id.* at 228). It is this absence of any actual diminishment that gives rise to the need for a showing of a discriminatory attack causing impairment of the independence and proper functioning of the Judiciary. Moreover, the Supreme Court of the United States has recognized that even actual, albeit indirect, reductions of judicial salaries, such as income taxation, violate the principles underlying the Compensation Clause only if such reductions "discriminate[ ] against the Judicial Branch" by "singling out judges for disadvantageous treatment" (*United States v Hatter*, 532 US at 576).

With respect to petitioners' first claim—and even giving them the benefit of every favorable inference, as we must in light of the posture of this case (*see Leon v Martinez*, 84 NY2d 83, 87-88 [1994], *supra*)—allegations that a number of judges have resigned or intend to do so for financial reasons are not sufficient to state a claim based upon impairment of the functioning of the judicial system. Again, separation of powers principles dictate that judicial intervention may be warranted "when legislative appropriations prove insufficient and legislative inaction obstructs the judiciary's ability to function," or there is an imminent threat that such functioning will be impaired (*N.Y. County Lawyers' Assn. v State of New York*, 192 Misc 2d at 436; *see Matter of Kelch v Town Bd. of Town of Davenport*, 36 AD3d at 1112-1113; *but see Larabee v Spitzer*, 19 Misc 3d at 234). The purpose of the separation of powers doctrine, however, is to "balance [the three branches'] overall power to protect the *public's* interests, not those individuals who occupy the offices of those [b]ranches at varying times" (*Cohen v State of New York*, 94 NY2d 1, 13 [1999], *supra*). Although petitioners' claim regarding an undisclosed number of resignations suggests that judges are experiencing a lamentable personal hardship due to the Legislature's inaction, that claim cannot be equated with an assertion that the Judiciary will not continue to function as in the past (*see Atkins v United States*, 556 F2d at 1055; *Kremer v Barbieri*, 48 Pa Commw at 567-568, 411 A2d at 562-563).[9]

The second ground upon which Supreme Court permitted petitioners' claim to proceed—that the Legislature has failed to act on the issue of judicial pay raises in retaliation for certain court decisions—is similarly insufficient to state a cause of action. We reiterate that the judicial branch, in fulfilling its constitutional function, must often challenge the actions of the legislative and executive branches, and it is for that very reason that the Compensation Clause exists—to combat the "ongoing threat" of "[r]etribution against the courts for unpopular decisions" (*Jorgensen v Blagojevich*, 211 Ill 2d 286, 300, 811 NE2d 652, 661 [2004], *supra*). To merely state the existence of this threat, without alleging any support whatsoever for the asser-

***

**9.** We note that there are two pending actions that are similar to the instant case: *Larabee v Spitzer (supra)* and *Kaye v Silver*, in which the Chief Judge seeks to compel an increase in compensation. Unlike *Larabee* or this case, *Kaye* does involve a claim that judicial compensation is substantively inadequate. Our decision should in no way be interpreted as expressing any opinion regarding the sufficiency of the allegations proffered by the Chief Judge in *Kaye*.

tion of displeasure on the part of the Legislature or evidence of any actions taken to reduce judicial salaries, is merely to acknowledge the inherent tension in our tripartite system of government. The existence of that ever-present tension cannot, on its own, be a violation of the Constitution that deliberately gave rise to it.

Absent any allegations of "fraud, corruption, oppression, illegality, unconstitutionality or a violation of public policy," such as an allegation that the independence and ability of the judicial branch to function has been imminently threatened or impaired, "courts do not inquire into the wisdom, reasons or motives for legislation" (*Matter of Kelch v Town Bd. of Town of Davenport*, 36 AD3d at 1111 [internal quotation marks and citations omitted]). Particularly in cases involving Compensation Clause challenges, "legislative reasoning . . . is generally irrelevant to the constitutional inquiry" because "[w]hat is at stake is the very independence of the judiciary and the preservation of separation of powers" (*Stilp v Commonwealth*, 588 Pa 539, 582, 905 A2d 918, 944 [2006], *supra* [internal quotation marks and citation omitted]).

Moreover, petitioners' claim of a retaliatory motive is highly speculative in the absence of any affirmative acts of the Legislature—such as the enactment of a statute—from which we could discern an intent to react to the referenced decisions regarding the separation of powers disputes between the Legislature and Governor, capital punishment, school funding and a case involving the election of a state senator (*cf. Matter of Kelch v Town Bd. of Town of Davenport*, 36 AD3d at 1112). Beyond the fact that some individual legislators (or the Governor) were very likely pleased with the outcome of those cases, "all the legislators and the Legislature itself are entitled to the presumption that they act only in accordance with and fulfillment of their oaths of office. We fully accord them that presumption" here (*Cohen v State of New York*, 94 NY2d at 13).

In addition, having otherwise failed to state a cause of action based upon a separation of powers violation, petitioners' claims regarding legislative motivation are barred by the Speech or Debate Clause, which provides that "[f]or any speech or debate in either house of the legislature, the members shall not be questioned in any other place" (NY Const, art III, § 11). That clause "serves to preserve the integrity of the Legislature by preventing other branches of government from interfering with legislators in the performance of their duties" (*People v Ohren-*

*stein*, 77 NY2d 38, 54 [1990]; *see Matter of Straniere v Silver*, 89 NY2d 825 [1996], *affg on op below* 218 AD2d 80, 83 [1996]). In that regard, its central role is "to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary" (*Gravel v United States*, 408 US 606, 617 [1972]).

The Speech or Debate Clause encompasses all legislative activity, i.e., acts that "are an integral part of the legislative process, . . . includ[ing] votes and speeches on the floor of the House *as well as the underlying motivations for these activities*," along with preparing committee reports and conducting committee hearings that do not occur on the floor of the House (*People v Ohrenstein*, 77 NY2d at 54 [emphasis added]; *see Matter of Straniere v Silver*, 218 AD2d at 83; *see also Bogan v Scott-Harris*, 523 US 44, 50 [1998], quoting *Wilson v New York*, 1 Denio 595, 599 [1845] ["(W)hen a . . . legislator exercises discretionary powers, he (or she) 'is exempt from all responsibility by action for the motives which influence him (or her), and the manner in which such duties are performed' "]). Speech or Debate Clause protection extends to the legislative body itself, as well as government officials in the executive branch when performing legislative functions (*see Bogan v Scott-Harris*, 523 US at 55; *Supreme Court of Va. v Consumers Union of United States, Inc.*, 446 US 719, 733-734 [1980]; *Warden v Pataki*, 35 F Supp 2d 354, 358 [1999], *affd sub nom. Chan v Pataki*, 201 F3d 430 [1999], *cert denied* 531 US 849 [2000]). Here, the Legislature's refusal to take action on judicial pay raise legislation indisputably constitutes the performance of a legislative function.

Nevertheless, we note that the Speech or Debate Clause "was designed to preserve legislative independence, not supremacy" (*United States v Brewster*, 408 US 501, 508 [1972]). Therefore, it could not bar judicial intervention in the face of an adequately stated claim that the Legislature had violated separation of powers principles by working harm or threatening imminent harm to the Judiciary's ability to continue functioning.[10] Petitioners, however, have not stated any such claim and, thus,

---

**10.** As respondents assert, this Court explained in *Matter of Straniere v Silver* (218 AD2d 80 [1996]) that "[b]ecause judgments of legality or constitutionality obviously involve 'questioning' of legislative acts, courts may not strip acts taken in the legislative process of their constitutional immunity by finding that the acts are substantively illegal or unconstitutional" (*id.* at 84 [some internal quotation marks and citation omitted]). While, generally, a claim that legislative activity is unconstitutional could not abrogate Speech or Debate immunity, we observe that *Straniere* is distinguishable inasmuch as it

the Speech or Debate Clause bars inquiry into the motives of the Governor or members of the Legislature in failing to take action on judicial pay raises.

In any event, petitioners' argument that the Legislature has acted in retaliation against the judicial branch for certain court decisions is entirely undercut by their repeated assertions that "the Legislature and the Governor admittedly have left the judges out in the cold for reasons *unrelated to judicial compensation*" (emphasis added). Petitioners make these assertions in connection with their "linkage" argument—that respondents have acted unconstitutionally in linking judicial pay raises to legislative and executive pay raises, along with a number of other unrelated initiatives. Linkage of judicial salaries to unrelated concerns "suggest[s] not a discriminatory assault upon the judicial branch, but the contrary" (*Atkins v United States*, 556 F2d at 1056). That is, the failure to raise judicial salaries, viewed in light of the inaction on legislative and executive salaries and political wrangling over unrelated issues, "appears not a device by which [the Legislature] sought to compromise the autonomy of judges . . . but an [in]action largely dictated by political concerns far removed from the judiciary" (*id.* at 1056-1057).

It is fatal to petitioners' linkage argument that nothing in the NY Constitution forbids the political branches from engaging in politics when carrying out their political functions. Again, the New York Compensation Clause reflects the view that "[t]he compensation of judges should . . . be left entirely to the [L]egislature, which after all is the body always directly in touch with and responsible to the people" (Judiciary Constitutional Convention of 1921, Rep to Legislature, Jan. 4, 1922, 1922 NY Legis Doc No. 37, at 29). The Compensation Clause leaves the power to increase judicial salaries entirely to the discretion of the political branches and, absent any allegations of an imminent threat to the continued functioning of the judicial branch, "it is not the province of the courts to direct the [L]egislature how to do its work" (*Urban Justice Ctr. v Pataki*, 38 AD3d 20, 27 [2006], *appeal dismissed and lv denied* 8 NY3d 958 [2007] [internal quotation marks and citations omitted]; *see*

---

did not involve a separation of powers challenge. In cases such as the instant matter, our task is different—we must "apply the Clause in such a way as to insure the independence of the legislature without altering the historic balance of the three co-equal branches of Government" (*United States v Brewster*, 408 US at 508).

*Campaign for Fiscal Equity, Inc. v State of New York*, 8 NY3d 14, 28-29 [2006], *supra*; *but see Larabee v Governor of State of N.Y.*, 20 Misc 3d 866, 877 [2008] [concluding that even absent any interference in judicial duties, linkage is an abuse of power that constitutes an unconstitutional interference with judicial independence]).

In sum, petitioners have failed to allege a discriminatory attack on the judicial branch that has impaired or imminently threatened the Judiciary's independence and ability to function, as necessary to state a cause of action based upon the separation of powers. Having concluded that their claims under both that doctrine and the Compensation Clause should have been dismissed in their entirety, we now turn briefly to petitioners' remaining claims—that they have been denied equal protection because the law of New York discriminates against them in various ways, and that mandamus lies to compel disbursement of the $69.5 million "dry appropriation" approved in 2006.

## III. Equal Protection

██ Petitioners argue that their equal protection rights have been violated because the Legislature has placed them in the same class as legislators in terms of salary increases, thereby rendering the Judiciary a "suspect class," and denying them their "fundamental right" contained in the Compensation Clause to "maintain[ ] the integrity of [their] salary and compensation." Apart from the fact that, as explained above, the Compensation Clause contains no guarantee that the value—or integrity, to use petitioners' phrasing—of judicial compensation will be maintained in the face of inflation, petitioners misapprehend the required elements of an equal protection claim. "The essence of a violation of the constitutional guarantee of equal protection is, of course, that all persons similarly situated must be treated alike" (*Bower Assoc. v Town of Pleasant Val.*, 2 NY3d 617, 630 [2004]). Even construing the petition liberally, petitioners have failed to allege that they have been treated differently from any similarly situated group or class (*cf. Weissman v Evans*, 56 NY2d 458, 464-466 [1982]); rather, petitioners point to differences between judges and legislators that render their *similar* treatment on the issue of compensation politically unwise. Accordingly, in the absence of any allegation that petitioners were selectively treated compared with others who are similarly situated, it cannot be said that Supreme Court erred in dismissing petitioners' equal protection claim.

Indeed, we agree with Supreme Court that due to the unique protection afforded judicial compensation by the NY Constitution, there is no group sufficiently similar to the Judiciary to state a cognizable equal protection cause of action. Nor can it be said that the Judiciary bears any of the traditional indicia of a suspect class—as constitutional officers granted unique salary protection, judges are not "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process" (*San Antonio Independent School Dist. v Rodriguez*, 411 US 1, 28 [1973]). Thus, a rational basis standard of review would apply to petitioners' equal protection claim (*see Affronti v Crosson*, 95 NY2d 713, 719 [2001], *cert denied sub nom. Affronti v Lippman*, 534 US 826 [2001]), and petitioners have failed to negate every conceivable rational basis for the Legislature's inaction in amending article 7-B of the Judiciary Law.

## IV. The 2006-2007 State Budget

■ Finally, we consider petitioners' argument that mandamus lies to compel the Comptroller to release the funds appropriated in the 2006-2007 state budget. The enacted budget at issue provided that $69.5 million was "[t]hereby appropriated and authorized to be paid . . . [f]or expenses necessary to fund adjustments in the compensation of state-paid judges and justices of the unified court system *pursuant to a chapter of the laws of 2006*" (L 2006, ch 51, § 2 [emphasis added]).[11] We note that "[m]andamus lies to compel the performance of a purely ministerial act [only] where there is a clear legal right to the relief sought" (*Klostermann v Cuomo*, 61 NY2d 525, 539 [1984], *supra* [internal quotation marks and citation omitted]). Inasmuch as the NY Constitution mandates that "[n]o money shall ever be paid out of the state treasury or any of its funds . . . unless such payment be made within two years next after the passage of [an] appropriation act" (NY Const, art VII, § 7; *see Matter of County of Oneida v Berle*, 49 NY2d 515, 521 n 4 [1980], *supra*)

---

11. The Court of Appeals has recognized the existence of such "non-appropriation" bills, explaining that they "contain programmatic provisions and commonly include sources, schedules and sub-allocations for funding provided by appropriation bills, along with provisions authorizing the disbursement of certain budgeted funds pursuant to subsequent legislative enactment" (*Silver v Pataki*, 96 NY2d 532, 535 n 1 [2001], *supra; accord Pataki v New York State Assembly*, 4 NY3d 75, 103 n 1 [2004], *supra* [Kaye, Ch. J., dissenting]).

and more than two years have passed, mandamus is no longer an available avenue of relief here.

Moreover, even assuming that a constitutional bar was not present, petitioners' contention that the 2006-2007 appropriation effectively amended Judiciary Law article 7-B is meritless. First, petitioners' argument is contrary to the language of chapter 51 of the Laws of 2006, which enacted the budget. Pursuant to the constitutional requirement that judicial compensation be "established by law" (NY Const, art VI, § 25 [a]), chapter 51 provided that the adjustments to judicial compensation would be made "pursuant to a chapter of the laws of 2006." While petitioners urge us to interpret that phrase as referring to chapter 51 itself, that provision set forth no method by which "adjustments in the compensation of state-paid judges and justices" could be made. The Judiciary's proffered budget contained an explanation of its request, but the bill passed by the Legislature contained no such explanation; nor did it contain any formula governing expenditure of the funds (cf. *Pataki v New York State Assembly*, 4 NY3d at 97-98). In short, there is no basis in chapter 51 to support a conclusion that the Legislature gave its imprimatur to the "pay parity" concept proposed in the judicial budget.

In our view, petitioners' construction of chapter 51 renders the phrase "pursuant to a chapter of the laws of 2006" superfluous in violation of the principle of statutory construction that courts must give effect to every word of a statute (*see* McKinney's Cons Laws of NY, Book 1, Statutes § 231; *see also Leader v Maroney, Ponzini & Spencer*, 97 NY2d 95, 104 [2001]). If the Legislature had intended the budget to be self-executing regarding compensation adjustment, there would have been no need to reference "a chapter of the laws of 2006." Given that "[t]he statutory text is the clearest indicator of legislative intent and courts should construe unambiguous language to give effect to its plain meaning" (*Matter of DaimlerChrysler Corp. v Spitzer*, 7 NY3d 653, 660 [2006]), chapter 51, on its face, cannot be said to provide a basis for the relief sought by petitioners here.

Second, we note that the legislative debates, which include a discussion of judicial salaries by the Chairs of the Senate Finance and Assembly Ways and Means Committees, also make plain the Legislature's intent to provide money in the budget in anticipation of possible adjustments to judicial compensation in a subsequent chapter law in 2006. These debates illustrate that the Legislature did not believe that chapter 51 itself authorized

raises for the Judiciary. In addition, and contrary to petitioners' argument, the fact that the Legislature deemed itself to have "finally acted on" all of the Governor's 2006-2007 budget bills (Legislative Law § 5 [3]) does not establish an intent that funds for judicial compensation reform be immediately disbursed. Legislative Law § 5, which prevents the legislators from receiving their salary until legislative passage of the budget, "serves as an incentive to complete constitutional budget obligations in a timely fashion" (*Cohen v State of New York*, 94 NY2d 1, 11 [1999], *supra*). Nothing in that section forbids "dry appropriations" or otherwise calls into question specified conditions, such as the enactment of a subsequent chapter law, imposed in a budget.

In sum, chapter 51 merely reflects the Legislature's intent that funds be made available for an event that did not occur, i.e., passage of a subsequent chapter law adjusting judicial salaries. Given the Legislature's clear expression of intent in chapter 51, petitioners' request that the courts declare that judicial salaries—required by our Constitution to be established by law—can be established by implication from that bill is untenable. Accordingly, their claim for disbursement of the $69.5 million in appropriated funds was properly dismissed.

We have considered the parties' remaining arguments, including petitioners' claim that *Campaign for Fiscal Equity, Inc. v State of New York* (8 NY3d 14 [2006], *supra*) and *Schultz v Harrison Radiator Div. Gen. Motors Corp.* (90 NY2d 311 [1997]) require a different result, and find them either to be rendered academic by our decision or otherwise lacking in merit.

PETERS, J. (concurring in part and dissenting in part). As the majority notes, since this matter involves a motion to dismiss for failure to state a cause of action (*see* CPLR 3211 [a] [7]), we must liberally construe the pleadings, grant petitioners the benefit of each favorable inference, and limit our review to a determination as to whether the facts they allege fall within a knowable legal theory (*see Leon v Martinez*, 84 NY2d 83, 88 [1994]). Applying this standard of review, Supreme Court permitted petitioners' separation of powers claim to proceed under two theories: (1) that the diminished actual value of their compensation impacted judicial independence by forcing judges to prematurely abandon their positions and (2) that a motivating force behind stagnant judicial compensation was retaliation for recent court rulings.

Given the early prediscovery phase of this litigation, I agree

with Supreme Court that petitioners sufficiently pleaded a viable separation of powers claim. Mindful that only the judicial branch is constrained by strict limitations on outside income (*see* 22 NYCRR 100.4) and that "[p]ermitting the governmental branch holding the purse strings to evaluate the performance of the judiciary and dole out pay based on those evaluations . . . strikes at the heart of judicial independence" (*Matter of Kelch v Town Bd. of Town of Davenport*, 36 AD3d 1110, 1112 [2007]), I believe Supreme Court properly resolved all claims before it and would affirm.

ROSE, LAHTINEN and KANE, JJ., concur with MERCURE, J.P.; PETERS, J., concurs in part and dissents in part in a separate opinion.

Ordered that the judgment is modified, on the law, without costs, by reversing so much thereof as partially denied respondents' motion to dismiss the petition; motion granted in its entirety and petition dismissed; and, as so modified, affirmed.